## OKLAHOMA PRESS PUBLISHING CO. v. WALLING, WAGE AND HOUR ADMINISTRATOR.

NO. 61.

Argued October 17, 18, 1945.—Decided February 11, 1946.

*Elisha Hanson* argued the cause for petitioners. With him on the briefs were *Joseph C. Stone* and *Charles A. Moon* in No. 61, and *Letitia Armistead* in No. 63.

*Irving J. Levy* argued the cause for respondent. With him on the brief were *Solicitor General McGrath, Ralph F. Fuchs, William S. Tyson* and *Bessie Margolin.*

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

These cases bring for decision important questions concerning the Administrator's right to judicial enforcement of *subpoenas duces tecum* issued by him in the course of investigations conducted pursuant to § 11 (a) of the Fair Labor Standards Act. 52 Stat. 1060. His claim is founded directly upon § 9, which incorporates the enforcement provisions of §§ 9 and 10 of the Federal Trade Commission Act, 38 Stat. 717.[1] The subpoenas sought the production of specified records to determine whether petitioners were violating the Fair Labor Standards Act, including records relating to coverage. Petitioners, newspaper publishing corporations, maintain that the Act is not applicable to them, for constitutional and other reasons, and insist that the question of coverage must be adjudicated before the subpoenas may be enforced.

---

[1] The pertinent portions of these various statutory provisions are set forth in notes 23 and 24.

In No. 61, involving the Oklahoma Press Publishing Company, the Circuit Court of Appeals for the Tenth Circuit has rejected this view, holding that the Administrator was entitled to enforcement upon showing of "probable cause," which it found had been made. 147 F. 2d 658. Accordingly it affirmed the district court's order directing that the Administrator be given access to the records and documents specified.[2]

In No. 63, the Circuit Court of Appeals for the Third Circuit likewise rejected the company's position, one judge dissenting on the ground that probable cause had not been shown. 148 F. 2d 57. It accordingly reversed the district court's order of dismissal in the proceeding to show cause, which in effect denied enforcement for want of a showing of coverage. 49 F. Supp. 659.[3] The

[2] Upon filing of the application, an order to show cause why enforcement should not be had was issued. Thereafter the matter was heard upon the pleadings, including the application and the respondent's return, together with affidavits filed by the parties. See note 4; also note 52 *infra*. The district court made findings of fact and conclusions of law, see 7 Wage Hour Rep. at 656, which among other things determined "that the Company herein is subject to the Wage and Hour Act"; and issued its order for inspection accordingly. As to this finding and conclusion the court of appeals said: "When the matter was submitted to the trial court on the rule to show cause, it concluded coverage, but it did not have to go that far." 147 F. 2d 658, 662.

[3] In No. 63, as in No. 61, an order to show cause issued on filing of the application. Upon return made, which included affidavits attached as exhibits, the court rendered its opinion and entered its order dismissing the proceedings, stating however that since the Administrator "has not had opportunity sufficiently to argue the question of coverage, that matter is left to such further proceedings as may be appropriate. . . ." 49 F. Supp. 659, 661. The opinion, noting that to deny enforcement "would be to divide proceedings into two distinct stages—one concerning the presence of 'Commerce,' and the other to determine other elements of violation," went on to say: "There would seem to be no compelling reason why such should not be the case, for if the act does not apply to a certain business or part of an industry, it would seem to follow that the provisions of the Act should not be applied thereto. . . ." 49 F. Supp. at 660.

court of appeals thought that requiring the Administrator "to make proof of coverage would be to turn the proceeding into a suit to decide a question which must be determined by the Administrator in the course of his investigation" and relied upon *Endicott Johnson Corp.* v. *Perkins*, 317 U. S. 501, as being persuasive that this could not be done. Regarding the subpoena as containing no unreasonable demand, it conceived the return and affidavits filed by the company, together with the Administrator's allegations of coverage,[4] as a showing sufficient to require enforcement. Hence it directed that the district court's discretion be exercised with that effect.

Because of the importance of the issues for administration of the Act and also on account of the differences in the grounds for the two decisions, as well as between them

---

[4] See note 53. The allegations of coverage in both applications were made upon information and belief and were general rather than specific or evidentiary in character. Each application set forth that the respondent was engaged in the business of publishing a newspaper or newspapers and by virtue of that activity was engaged in interstate commerce or in the production of goods for such commerce within the meaning of the Act.

In No. 61 the further allegations appeared that in the course of its business the company "receives and sends daily news, intelligence, and communications in interstate commerce, and transports, ships and delivers goods produced by it from points within" to points outside Oklahoma; and that the Administrator "having reasonable grounds to believe that the company" was violating specified sections of the Act, entered to make an investigation as provided in § 11 (a), was refused permission to inspect records, etc.

Apart from one affidavit filed by the Administrator in No. 61 setting forth the circumstances of the company's failure to appear in response to the subpoena, no other facts, beyond the allegations of the application, were submitted by him in either case. The companies however filed affidavits in both proceedings, which supplied additional facts, as well as the affiants' conclusions, concerning coverage. See text, Part IV, at notes 52, 53.

and decisions from other circuits,[5] certiorari was granted in both cases. 325 U. S. 845.

The issues have taken wide range. They are substantially the same in the two causes, except in one respect to be noted.[6] In addition to an argument from Congress' intent, reliance falls upon various constitutional provisions, including the First, Fourth and Fifth Amendments, as well as the limited reach of the commerce clause, to show that the Administrator's conduct and the relief he seeks are forbidden.

## I.

Coloring almost all of petitioners' position, as we understand them, is a primary misconception that the First Amendment knocks out any possible application of the Fair Labor Standards Act to the business of publishing and distributing newspapers. The argument has two prongs.

The broadside assertion that petitioners "could not be covered by the Act," for the reason that "application of this Act to its newspaper publishing business would violate its rights as guaranteed by the First Amendment," is

---

[5] Specifically, *General Tobacco & Grocery Co.* v. *Fleming*, 125 F. 2d 596 (C. C. A. 6), modified in *Walling* v. *La Belle Steamship Co.*, 148 F. 2d 198, following the decision in *Endicott Johnson Corp.* v. *Perkins*, 317 U. S. 501, as to which see note 49 *infra* and text. The decisions in other circuits which have passed on the matter are substantially in accord with the results in No. 61. See *Martin Typewriter Co.* v. *Walling*, 135 F. 2d 918 (C. C. A. 1); *Walling* v. *Standard Dredging Corp.*, 132 F. 2d 322 (C. C. A. 2); *Walling* v. *American Rolbal Corp.*, 135 F. 2d 1003 (C. C. A. 2); *Cudahy Packing Co.* v. *Fleming*, 119 F. 2d 209 (C. C. A. 5), rev'd on other grounds, 315 U. S. 357; *Cudahy Packing Co.* v. *Fleming*, 122 F. 2d 1005 (C. C. A. 8), rev'd on other grounds, 315 U. S. 785; *Mississippi Road Supply Co.* v. *Walling*, 136 F. 2d 391 (C. C. A. 5); *Fleming* v. *Montgomery Ward & Co.*, 114 F. 2d 384 (C. C. A. 7); *Walling* v. *Benson*, 137 F. 2d 501 (C. C. A. 8).

[6] See Part IV.

without merit. *Associated Press* v. *Labor Board*, 301 U. S. 103, and *Associated Press* v. *United States*, 326 U. S. 1; *Mabee* v. *White Plains Publishing Co.*, 327 U. S. 178.[7] If Congress can remove obstructions to commerce by requiring publishers to bargain collectively with employees and refrain from interfering with their rights of self-organization, matters closely related to eliminating low wages and long hours, Congress likewise may strike directly at those evils when they adversely affect commerce. *United States* v. *Darby*, 312 U. S. 100, 116, 117. The Amendment does not forbid this or other regulation which ends in no restraint upon expression or in any other evil outlawed by its terms and purposes.[8]

Petitioners' narrower argument, of allegedly invalid classification,[9] arises from the statutory exemptions and may be shortly dismissed. The intimation that the Act falls by reason of the exclusion of seamen, farm workers and others by § 13 (a) is hardly more than a suggestion and is dismissed accordingly. Cf. *Buck* v. *Bell*, 274 U. S. 200, 208. The contention drawn from the exemption of employees of small newspapers by § 13 (a) (8) deserves only slightly more attention.[10] It seems to be twofold,

---

[7] See also *Sun Publishing Co.* v. *Walling*, 140 F. 2d 445; *Fleming* v. *Lowell Sun Co.*, 36 F. Supp. 320, rev'd on other grounds, 120 F. 2d 213, affirmed, 315 U. S. 784.

[8] No question is presented whether Congress could enforce its mandate by excluding from commerce the circulation of a publisher refusing to conform. Cf. *Sun Publishing Co.* v. *Walling*, 140 F. 2d 445, 449.

[9] Since the Fifth Amendment, unlike the Fourteenth, contains no "equal protection" clause, petitioners burden due process with this duty here.

[10] The provision is as follows: "Sec. 13. (a) The provisions of sections 6 and 7 shall not apply with respect to . . . (8) any employee employed in connection with the publication of any weekly or semiweekly newspaper with a circulation of less than three thousand

that the Amendment forbids Congress to "regulate the press by classifying it" at all and in any event that it cannot use volume of circulation or size as a factor in the classification.[11]

Reliance upon *Grosjean* v. *American Press Co.*, 297 U. S. 233, to support these claims is misplaced. There the state statute singled out newspapers for special taxation and was held in effect to graduate the tax in accordance with volume of circulation. Here there was no singling out of the press for treatment different from that accorded other business in general. Rather the Act's purpose was to place publishers of newspapers upon the same plane with other businesses and the exemption for small newspapers had the same object. 83 Cong. Rec. 7445. Nothing in the *Grosjean* case forbids Congress to exempt some publishers because of size from either a tax or a regulation which would be valid if applied to all.

What has been said also disposes of the contention drawn from the scope of the commerce power and its applicability to the publishing business considered independently of the Amendment's influence. *Associated Press* v. *Labor Board, supra; Associated Press* v. *United States, supra.*

## II.

Other questions pertain to whether enforcement of the subpoenas as directed by the circuit courts of appeals will violate any of petitioners' rights secured by the Fourth

the major part of which circulation is within the county where printed and published . . ."

The exemption shows conclusively that Congress intended the Act to apply to employees of publishers not within the terms of the exemption.

[11] To support these views, petitioners give interesting statistics concerning the total number of papers in the country, the number published daily, daily and Sunday, weekly, semiweekly and triweekly, and the number in each group having more or less than 3,000 circulation.

Amendment and related issues concerning Congress' intent. It is claimed that enforcement would permit the Administrator to conduct general fishing expeditions into petitioners' books, records and papers, in order to secure evidence that they have violated the Act, without a prior charge or complaint and simply to secure information upon which to base one, all allegedly in violation of the Amendment's search and seizure provisions. Supporting this is an argument that Congress did not intend such use to be made of the delegated power, which rests in part upon asserted constitutional implications, but primarily upon the reports of legislative committees, particularly in the House of Representatives, made in passing upon appropriations for years subsequent to the Act's effective date.[12]

The short answer to the Fourth Amendment objections is that the records in these cases present no question of actual search and seizure, but raise only the question whether orders of court for the production of specified records have been validly made; and no sufficient showing appears to justify setting them aside.[13] No officer or other person has sought to enter petitioners' premises against their will, to search them, or to seize or examine their books, records or papers without their assent, otherwise than pursuant to orders of court authorized by law and made after adequate opportunity to present objections, which in fact were made.[14] Nor has any objection been taken to the breadth of the subpoenas or to any other specific defect which would invalidate them.[15]

---

[12] See note 21. The Act became effective June 25, 1938.

[13] As to the sufficiency of the showing, see Part IV.

[14] Cf. notes 2, 3, 4. The facts in both cases show that petitioners, when served with the subpoenas, declined to honor them upon the advice of counsel, and thereafter the Administrator applied to the court for enforcement in each case.

[15] Cf. text *infra* at notes 42–47; see also note 40.

What petitioners seek is not to prevent an unlawful search and seizure. It is rather a total immunity to the Act's provisions, applicable to all others similarly situated, requiring them to submit their pertinent records for the Administrator's inspection under every judicial safeguard, after and only after an order of court made pursuant to and in exact compliance with authority granted by Congress. This broad claim of immunity no doubt is induced by petitioners' First Amendment contentions. But beyond them it is rested also upon conceptions of the Fourth Amendment equally lacking in merit.

Petitioners' plea that the Fourth Amendment places them so far above the law that they are beyond the reach of congressional and judicial power as those powers have been exerted here only raises the ghost of controversy long since settled adversely to their claim.[16] They have advanced no claim founded on the Fifth Amendment's somewhat related guaranty against self-incrimination, whether or not for the sufficient reason among others that this privilege gives no protection to corporations or their officers against the production of corporate records pursuant to lawful judicial order, which is all these cases involve.[17]

The cited authorities would be sufficient to dispose of the Fourth Amendment argument, and more recent decisions confirm their ruling.[18] Petitioners however are insistent in their contrary views, both upon the constitutional phases and in their asserted bearing upon the intention of Congress. While we think those views reflect a confusion not justified by the actual state of the decisions, the confusion has acquired some currency, as the

[16] See the authorities cited in notes 31 and 32.

[17] *Hale* v. *Henkel*, 201 U. S. 43; *Wilson* v. *United States*, 221 U. S. 361; *Essgee Co.* v. *United States*, 262 U. S. 151; *United States* v. *Bausch & Lomb Optical Co.*, 321 U. S. 707, 726; cf. *United States* v. *White*, 322 U. S. 694.

[18] *Endicott Johnson Corp.* v. *Perkins*, 317 U. S. 501; *Myers* v. *Bethlehem Corp.*, 303 U. S. 41, discussed *infra*, Part III, at notes 49–51.

divided state of opinion among the circuits shows.[19]  Since the matter is of some importance, in order to remove any possible basis for like misunderstanding in the future, we give more detailed consideration to the views advanced and to the authorities than would otherwise be necessary.

There are two difficulties with petitioners' theory concerning the intent of Congress.  One is that the argument from the so-called legislative history flies in the face of the powers expressly granted to the Administrator and the courts by §§ 9 and 11 (a), so flatly that to accept petitioners' view would largely nullify them.[20]  Furthermore the excerpted history from the later appropriation matters does not give the full story and when that is considered the claimed interpretation is not made out, regardless of its retrospective aspect.[21]  Moreover, the

---

[19] Cf. note 5 and text.

[20] In such a situation, without an accompanying change in the statute's language, an expression in committee reports on subsequent appropriations, coming largely from one house, hardly can be held to change or qualify the plain and unambiguous wording of the statute. Such a result would amount to retroactive amendment by committee report, a step in construction by reference to "prospective legislative history" not heretofore taken.

[21] The controversy as to appropriations arose over the Administrator's request for sufficient funds to allow a periodic routine inspection of every plant that might be covered by the Act.  See Hearings before the Subcommittee of the Committee on Appropriations of the House of Representatives on the Department of Labor—Federal Security Agency Appropriation Bill for 1942, 77th Cong., 1st Sess., Pt. 1, 347–350.  The Senate had acceded to this request.  But the House Appropriations Committee thought the cost unjustifiable and therefore recommended that only enough funds be made available to permit the Administrator to make "spot inspections" of twenty-five per cent of the plants and also to permit him to inspect all plants against which complaints had actually been registered.  H. Rep. No. 688, 77th Cong., 1st Sess., 13–14; see also 87 Cong. Rec. 4629, 5682–5683. After the conferees had been unable to come to an agreement and the House had instructed its conferees to insist on the smaller appropria-

statute's language leaves no room to doubt that Congress intended to authorize just what the Administrator did and sought to have the courts do.[22]  Section 11 (a) ex-

tion, 87 Cong. Rec. 5682–5686, the Senate accepted the House version of the appropriation bill.  87 Cong. Rec. 5703.

In the following year, 1942, the House Appropriations Committee noted with disapproval that "the spot-checking system approved by the Congress" had not been adopted and reiterated its desire that the recommended procedure be followed.  H. Rep. No. 2200, 77th Cong., 2d Sess., 8.  See also Hearings before the Subcommittee of the Committee on Appropriations of the House of Representatives on the Department of Labor—Federal Security Agency Appropriation Bill for 1943, 77th Cong., 2d Sess., Pt. 1, 281–284; cf. Hearings before the Subcommittee of the Committee on Appropriations of the House of Representatives on the Department of Labor—Federal Security Agency Appropriation Bill for 1945, 78th Cong., 2d Sess., Pt. 1, 403–405.

This history falls far short of sustaining the view that Congress had no intent, either when the statute was enacted or later, that the Administrator should have the powers of investigation expressly and clearly conferred upon him.

[22] The sparse legislative history bearing on the question contains nothing to the contrary.  The bills originally introduced did not incorporate §§ 9 and 10 of the Federal Trade Commission Act but contained substantially similar provisions.  S. 2475, 75th Cong., 1st Sess., § 15, 81 Cong. Rec. 4961; H. R. 7200, 75th Cong., 1st Sess., § 15, 81 Cong. Rec. 4998.  The House Committee on Labor reported of this section (then § 12) that it "contains the usual administrative provisions authorizing the Board to conduct investigations, subpena witnesses, and compel testimony."  H. Rep. No. 1452, 75th Cong., 1st Sess., 18, also page 10.  The Senate Committee used the same language.  S. Rep. No. 884, 75th Cong., 1st Sess., 8.  The House bill having been recommitted to the Committee, 82 Cong. Rec. 1834–1835, it drafted the subpoena section (then § 7) into essentially its present form.  See H. Rep. No. 2182, 75th Cong., 2d Sess., 3, 11.  The only substantial difference was that the subpoena power was given for the purpose of any "hearing" but not for the purpose of any "investigation."  However, § 15 (b) of the bills introduced in both houses, *supra,* granted the subpoena power "for the purpose of any investigation or any other proceeding under this Act. . . ."  And compare § 15 (a).  The difference was remedied by the Senate and House

pressly authorizes the Administrator to "enter and inspect such places and such records (and make such transcriptions thereof), question such employees, and investigate such facts, conditions, practices, or matters as he may deem necessary or appropriate to determine whether any person has violated any provision of this Act, or which may aid in the enforcement of the provisions of this Act." [23]   The subpoena power conferred by § 9 (through adoption of § 9 of the Federal Trade Commission Act) is

conferees; for out of conference came § 9 as it is now written. 83 Cong. Rec. 9160; 83 Cong. Rec. 9248, 9254. See also *Cudahy Packing Co.* v. *Holland,* 315 U. S. 357, 362, n. 3.

Nothing in the reports or the discussion suggests that the power was not to be exercised, or that subpoenas issued in compliance with the terms of the statute were not to be enforced, exactly in accordance with the authority given.

[23] Section 11 (a) is as follows: "The Administrator or his designated representatives may investigate and gather data regarding the wages, hours, and other conditions and practices of employment in any industry subject to this Act, and may enter and inspect such places and such records (and make such transcriptions thereof), question such employees, and investigate such facts, conditions, practices, or matters as he may deem necessary or appropriate to determine whether any person has violated any provision of this Act, or which may aid in the enforcement of the provisions of this Act.   Except as provided in section 12 and in subsection (b) of this section, the Administrator shall utilize the bureaus and divisions of the Department of Labor for all the investigations and inspections necessary under this section.   Except as provided in section 12, the Administrator shall bring all actions under section 17 to restrain violations of this Act."

The section thus authorizes both general and specific investigations, one for gathering statistical information concerning entire industries, cf. *Walling* v. *American Rolbal Corp.,* 135 F. 2d 1003, the other to discover specific violations.   The pattern has become common since its introduction into federal law by the Interstate Commerce Commission legislation.   See the summary given as to both federal and state instances in Handler, The Constitutionality of Investigations by the Federal Trade Commission (1928) 28 Col. L. Rev. 708, 905, at 905–909; see also 925–929.

given in aid of this investigation and, in case of disobedience, the district courts are called upon to enforce the subpoena through their contempt powers,[24] without express condition requiring showing of coverage.[25]

---

[24] Section 9 of the Fair Labor Standards Act reads: "For the purpose of any hearing or investigation provided for in this Act, the provisions of sections 9 and 10 (relating to the attendance of witnesses and the production of books, papers, and documents) of the Federal Trade Commission Act of September 16, 1914, as amended (U. S. C., 1934 edition, title 15, secs. 49 and 50), are hereby made applicable to the jurisdiction, powers, and duties of the Administrator, the Chief of the Children's Bureau, and the industry committees."

Section 9 of the Federal Trade Commission Act, 38 Stat. 717, provides that, for the purposes of the authorized investigations, the Commission or its agents shall have access to and the right to copy "any documentary evidence of any corporation being investigated or proceeded against," with the power to require by subpoena "the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation."

The section then proceeds: ". . . in case of disobedience to a subpoena the commission may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

"Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any corporation or other person, issue an order requiring such corporation or other person to appear before the commission, or to produce documentary evidence if so ordered, or to give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof."

Section 9 also contains a provision for immunity of individuals from prosecution, penalty or forfeiture on account of testimony or evidence produced in response to the subpoena.

Section 10 imposes criminal penalties upon "any person who shall neglect or refuse to attend and testify, or to answer any lawful inquiry, or to produce documentary evidence, if in his power to do so, in obedience to the subpoena or lawful requirement of the commission . . ." No question is presented in these cases concerning this provision.

[25] See Part IV, at note 54; also note 24.

In view of these provisions, with which the Administrator's action was in exact compliance, this case presents an instance of "the most explicit language" [26] which leaves no room for questioning Congress' intent. The very purpose of the subpoena and of the order, as of the authorized investigation, is to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the Administrator's judgment, the facts thus discovered should justify doing so.

Accordingly, if §§ 9 and 11 (a) are not to be construed as authorizing enforcement of the orders, it must be, as petitioners say, because this construction would make them so dubious constitutionally as to compel resort to an interpretation which saves rather than to one which destroys or is likely to do so. The Court has adopted this course at least once in this type of case.[27] But if the same course is followed here, the judgments must be reversed with the effect of cutting squarely into the power of Congress. For to deny the validity of the orders would be in effect to deny not only Congress' power to enact the provisions sustaining them, but also its authority to delegate effective power to investigate violations of its own laws, if not perhaps also its own power to make such investigations.

---

[26] See note 27.

[27] See *Federal Trade Commission* v. *American Tobacco Co.,* 264 U. S. 298, 305–306, in which Mr. Justice Holmes speaking for the Court said: "Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire (*Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 479), and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime. We do not discuss the question whether it could do so if it tried, as nothing short of the most explicit language would induce us to attribute to Congress that intent." See also note 40. Cf. *Boyd* v. *United States,* 116 U. S. 616; *Hale* v. *Henkel,* 201 U. S. 43; *Harriman* v. *Interstate Commerce Commission,* 211 U. S. 407.

## III.

The primary source of misconception concerning the Fourth Amendment's function lies perhaps in the identification of cases involving so-called "figurative" or "constructive" search with cases of actual search and seizure.[28] Only in this analogical sense can any question related to search and seizure be thought to arise in situations which, like the present ones, involve only the validity of authorized judicial orders.

The confusion is due in part to the fact that this is the very kind of situation in which the decisions have moved with variant direction, although without actual conflict when all of the facts in each case are taken into account. Notwithstanding this, emphasis and tone at times are highly contrasting, with consequent overtones of doubt and confusion for validity of the statute or its application. The subject matter perhaps too often has been generative of heat rather than light, for the border along which the cases lie is one where government intrudes upon different areas of privacy and the history of such intrusions has brought forth some of the stoutest and most effec-

---

[28] "In other words, the subpoena is equivalent to a search and seizure and to be constitutional it must be a *reasonable* exercise of the power." Lasson, Development of the Fourth Amendment to the United States Constitution, 137, citing *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447; *Hale* v. *Henkel,* 201 U. S. 43, 76. Cf. *Boyd* v. *United States,* 116 U. S. at 634–635 (as to which see also notes 33 and 36): ". . . We are further of opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited . . . is the equivalent of a search and seizure—and an unreasonable search and seizure—within the meaning of the Fourth Amendment."

See also Handler, Constitutionality of Investigations of the Federal Trade Commission (1928) 28 Col. L. Rev. 708, 905, at 909 ff., and authorities cited, characterizing the identification of an order for production with an actual search or seizure as "the figurative interpretation." P. 917, n. 56.

tive instances of resistance to excess of governmental authority.[29]

The matter of requiring the production of books and records to secure evidence is not as one-sided, in this kind of situation, as the most extreme expressions of either emphasis would indicate. With some obvious exceptions, there has always been a real problem of balancing the public interest against private security. The cases for protection of the opposing interests are stated as clearly as anywhere perhaps in the summations, quoted in the margin,[30] of two former members of this Court, each of

[29] See, in addition to the better known accounts of writs of assistance cited in *Goldman* v. *United States*, dissenting opinion, 316 U. S. at 139, n. 5, Lasson, Development of the Fourth Amendment to the United States Constitution (1937).

[30] The case for protection of the public interest was stated as follows: "The opinion of the court reminds us of the dangers that wait upon the abuse of power by officialdom unchained. The warning is so fraught with truth that it can never be untimely. But timely too is the reminder, as a host of impoverished investors will be ready to attest, that there are dangers in untruths and half truths when certificates masquerading as securities pass current in the market. There are dangers in spreading a belief that untruths and half truths, designed to be passed on for the guidance of confiding buyers, are to be ranked as peccadillos, or even perhaps as part of the amenities of business. . . . A Commission which is without coercive powers, which cannot arrest or amerce or imprison though a crime has been uncovered, or even punish for contempt, but can only inquire and report, the propriety of every question in the course of the inquiry being subject to the supervision of the ordinary courts of justice, is likened with denunciatory fervor to the Star Chamber of the Stuarts. Historians may find hyperbole in the sanguinary simile." Mr. Justice Cardozo, with whom joined the present Chief Justice and Mr. Justice Brandeis, dissenting in *Jones* v. *Securities & Exchange Commission*, 298 U. S. 1, 32–33. See also Handler, Constitutionality of Investigations of the Federal Trade Commission (1928) 28 Col. L. Rev. 708, 905, particularly at 933 ff.

On the other hand, the case for protected privacy was put by Mr. Justice Brandeis, dissenting, in *Olmstead* v. *United States*, 277 U. S. 438, 478–479: "The makers of our Constitution undertook to secure

whom was fully alive to the dual necessity of safeguarding adequately the public and the private interest. But emphasis has not always been so aptly placed.

The confusion obscuring the basic distinction between actual and so-called "constructive" search has been accentuated where the records and papers sought are of corporate character, as in these cases. Historically private corporations have been subject to broad visitorial power, both in England and in this country. And it long has been established that Congress may exercise wide investigative power over them, analogous to the visitorial power of the incorporating state,[31] when their activities take place within or affect interstate commerce.[32] Cor-

conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth."

[31] *Wilson* v. *United States,* 221 U. S. 361, 382; *Hale* v. *Henkel,* 201 U. S. 43, 74–75; The Fourth and Fifth Amendments and the Visitorial Power of Congress over State Corporations, Note (1930) 30 Col. L. Rev. 103.

[32] *Ibid.; Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447; *Interstate Commerce Commission* v. *Baird,* 194 U. S. 25; *Baltimore & Ohio R. Co.* v. *Interstate Commerce Commission,* 221 U. S. 612; *Interstate Commerce Commission* v. *Goodrich Transit Co.,* 224 U. S. 194; *United States* v. *Louisville & N. R. Co.,* 236 U. S. 318; *Smith* v. *Interstate Commerce Commission,* 245 U. S. 33; *United States* v. *New York Central R. Co.,* 272 U. S. 457; cf., however, *Harriman* v. *Interstate Commerce Commission,* 211 U. S. 407; *Federal*

respondingly it has been settled that corporations are not entitled to all of the constitutional protections which private individuals have in these and related matters. As has been noted, they are not at all within the privilege against self-incrimination, although this Court more than once has said that the privilege runs very closely with the Fourth Amendment's search and seizure provisions.[33] It is also settled that an officer of the company cannot refuse to produce its records in his possession, upon the plea that they either will incriminate him or may incriminate it.[34] And, although the Fourth Amendment has been

*Trade Commission* v. *Claire Furnace Co.,* 274 U. S. 160. And see Handler, Constitutionality of Investigations by the Federal Trade Commission (1928) 28 Col. L. Rev. 708, 903.

The power is not limited to inquiring concerning matters which Congress may regulate otherwise than by requiring the production of information, at any rate when it is made to appear that some phase of the activity is in commerce or affects it. See *United States* v. *New York Central R. Co.,* 272 U. S. 457, 464, and authorities cited; *Federal Trade Commission* v. *Claire Furnace Co.,* 274 U. S. 160. Nor must the "jurisdictional" line be drawn in such cases before the information is called for. Cf. *Myers* v. *Bethlehem Corp.,* 303 U. S. 41; Handler, *op. cit. supra,* at 918 ff., and authorities cited.

[33] In the leading case of *Boyd* v. *United States,* 116 U. S. 616, 630, Mr. Justice Bradley, speaking for the Court in relation to the compelled production of "a man's own testimony or of his private papers [specifically a business invoice] to be used as evidence to convict him of crime or to forfeit his goods," said in a much quoted statement: "In this regard the Fourth and Fifth Amendments run almost into each other." The opinion, quoting at length from Lord Camden's discussion in the historic case of *Entick* v. *Carrington,* 19 Howell's State Trials 1029, relies strongly in this phase upon his conjunction of the right to freedom from search and seizure "where the law forceth evidence out of the owner's custody by process" and the privilege against self-incrimination. 116 U. S. at 629. Cf. also the statement of Mr. Justice Brandeis, quoted *supra* note 30.

[34] *Wilson* v. *United States,* 221 U. S. 361; *Hale* v. *Henkel,* 201 U. S. 43; *Interstate Commerce Commission* v. *Baird,* 194 U. S. 25.

held applicable to corporations[35] notwithstanding their exclusion from the privilege against self-incrimination, the same leading case of *Wilson* v. *United States,* 221 U. S. 361, distinguishing the earlier quite different one of *Boyd* v. *United States,* 116 U. S. 616,[36] held the process not invalid under the Fourth Amendment, although it broadly required the production of copies of letters and telegrams "signed or purporting to be signed by the President of said company during the month[s] of May and June, 1909; in regard to an alleged violation of the statutes of the United States by C. C. Wilson." 221 U. S. at 368, 375.

The *Wilson* case has set the pattern of later decisions and has been followed without qualification of its ruling.[37] Contrary suggestions or implications may be explained as dicta;[38] or by virtue of the presence of an actual illegal search and seizure, the effects of which the Government sought later to overcome by applying the more liberal doc-

---

[35] *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *Hale* v. *Henkel,* 201 U. S. 43; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 448 ff. See also *Consolidated Rendering Co.* v. *Vermont,* 207 U. S. 541.

[36] See note 33. The ruling was limited, in view of the facts, to criminal proceedings and proceedings for forfeiture of property. Only a single document was called for. The vitiating element lay in the incriminating character of the unusual provision for enforcement. The statute provided that failure to produce might be taken as a confession of whatever might be alleged in the motion for production.

[37] See notes 31, 32, 40. Thus far Congress has not seen fit to leave to administrative officials authority to enforce subpoenas. The pattern adopted in §§ 9 and 10 of the Federal Trade Commission Act, of referring enforcement to the courts, has become accepted, whether by virtue of reflections of the opinion in *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, or for other reasons. The extent to which the pattern has been adopted is summarized, partially at least, in Handler, *op. cit. supra,* at 925 ff.

[38] See, for example, *Essgee Co.* v. *United States,* 262 U. S. 151.

trine developed in relation to "constructive search"; [39] or by the scope of the subpoena in calling for documents so broadly or indefinitely that it was thought to approach in this respect the character of a general warrant or writ of assistance, odious in both English and American history.[40]  But no case has been cited or found in which,

[39] E. g., in *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385, government officers, after arresting corporate officials at their homes, "without a shadow of authority went to the office of their company and made a clean sweep of all the books, papers and documents found there," taking them to the district attorney's office, where they were photographed.  After an order of court to return the originals, but impounding the copies, subpoenas to produce the originals were enforced by an order, the refusal to obey which was held a contempt. The Court's strong language in reversing this decision undoubtedly was called forth by the Government's effort, not to say subterfuge, thus to avoid the effects of its initial wrong.  Cf. *Weeks* v. *United States*, 232 U. S. 383; *Gouled* v. *United States*, 255 U. S. 298.

[40] Thus, the aggravating circumstance in *Federal Trade Commission* v. *American Tobacco Co.*, 264 U. S. 298, cf. note 27, seems to have been the Commission's claim of "an unlimited right of access to the respondents' papers with reference to the possible existence of practices in violation of § 5."  264 U. S. at 305.  The Court said: "It is contrary to the first principles of justice to allow a search through all the respondents' records, *relevant or irrelevant,* in the hope that something will turn up."  P. 306.  (Emphasis added.)  Cf. *Silverthorne Lumber Co.* v. *United States, supra,* note 39.

However in *Wheeler* v. *United States*, 226 U. S. 478, where no element of actual search and seizure was present, a subpoena was enforced which called for copies of all letters and telegrams, all cash books, ledgers, journals and other account books of the corporation covering a period of fifteen months; cf. *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447.  And in *Brown* v. *United States*, 276 U. S. 134, the subpoena called for all letters, telegrams or copies thereof passing between a national trade association and its members, including their officers and agents, over a period of two and one-half years, with reference to eighteen different items.  The Court, by Mr. Justice Sutherland, said: "The subpoena . . . specifies a reasonable period of time and, with reasonable particularity, the subjects to which the documents called for relate.  The question is ruled, not by *Hale*

upon similar facts, the *Wilson* doctrine has not been followed. Nor in any has Congress been adjudged to have exceeded its authority, with the single exception of *Boyd* v. *United States, supra,* which differed from both the *Wilson* case and the present ones in providing a drastically incriminating method of enforcement [41] which was applied to the production of partners' business records. Whatever limits there may be to congressional power to provide for the production of corporate or other business records, therefore, they are not to be found, in view of the course of prior decisions, in any such absolute or universal immunity as petitioners seek.

Without attempt to summarize or accurately distinguish all of the cases, the fair distillation, in so far as they apply merely to the production of corporate records and papers in response to a subpoena or order authorized by law and safeguarded by judicial sanction, seems to be that the Fifth Amendment affords no protection by virtue of the self-incrimination provision, whether for the corporation or for its officers; and the Fourth, if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be "particularly described," if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.

As this has taken form in the decisions, the following specific results have been worked out. It is not necessary,

v. *Henkel,* but by *Consolidated Rendering Co.* v. *Vermont,* 207 U. S. 541, 553–554, and *Wheeler* v. *United States,"* supra.

With reference to the breadth of the subpoena or order for production in the scope of what is called for, in addition to the authorities cited in this note and note 45, see *Hammond Packing Co.* v. *Arkansas,* 212 U. S. 322; *United States* v. *Bausch & Lomb Optical Co.,* 321 U. S. 707; Handler, *op. cit. supra,* at 913 ff.

[41] See note 36.

as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. It is enough that the investigation be for a lawfully authorized purpose, within the power of Congress to command. This has been ruled most often perhaps in relation to grand jury investigations,[42] but also frequently in respect to general or statistical investigations authorized by Congress.[43] The requirement of "probable cause, supported by oath or affirmation," literally applicable in the case of a warrant, is satisfied in that of an order for production by the court's determination that the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry.[44] Beyond this the requirement of reasonableness, including particularity in "describing the place to be searched, and the persons or things to be seized," also literally applicable to warrants, comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, as has been said, this cannot be reduced to formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry.[45]

When these principles are applied to the facts of the present cases, it is impossible to conceive how a violation of petitioners' rights could have been involved. Both

[42] E. g., *Hale* v. *Henkel*, 201 U. S. 43; *Wilson* v. *United States*, 221 U. S. 361, 372.

[43] *Smith* v. *Interstate Commerce Commission*, 245 U. S. 33; *Baltimore & Ohio R. Co.* v. *Interstate Commerce Commission*, 221 U. S. 612; cf. *Interstate Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194; *Harriman* v. *Interstate Commerce Commission*, 211 U. S. 407, 419. And see Handler, *op. cit. supra*, 918 ff.

[44] Cf. the authorities cited in notes 42 and 43.

[45] Cf. *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 357; *Boyd* v. *United States*, 116 U. S. at 630, and note 40 *supra*.

were corporations. The only records or documents sought were corporate ones. No possible element of self-incrimination was therefore presented or in fact claimed. All the records sought were relevant to the authorized inquiry,[46] the purpose of which was to determine two issues, whether petitioners were subject to the Act and, if so, whether they were violating it. These were subjects of investigation authorized by § 11 (a), the latter expressly, the former by necessary implication.[47] It is not to be doubted that Congress could authorize investigation of hese matters. In all these respects,[48] the specifications

---

[46] The subpoena in No. 61 called for production of:

"All of your books, papers and documents showing the hours worked by and wages paid to each of your employees between October 28, 1938, and the date hereof, including all payroll ledgers, time sheets, time cards and time clock records, and all your books, papers and documents showing the distribution of papers outside the State of Oklahoma, the dissemination of news outside the State of Oklahoma, the source and receipt of news from outside the State of Oklahoma, and the source and receipt of advertisements of nationally advertised goods."

The specification in No. 63 was substantially identical except for the period of time covered by the demands.

[47] See the language of the section, note 24 *supra*. Of course violation could be found only in situations where coverage would exist. Authority to investigate the existence of violations accordingly included authority to investigate coverage. Cf. *Endicott Johnson Corp.* v. *Perkins*, 317 U. S. 501; *Myers* v. *Bethlehem Corp.*, 303 U. S. 41, discussed in the text herein at notes 49-51; and authorities cited in note 32 *supra*.

[48] The description was made with all of the particularity the nature of the inquiry and the Administrator's situation would permit. See note 46. The subpoenas were limited to the books, papers and documents of the respective corporations, to which alone they were addressed. They required production at specified times and places in the cities of publication and stated the purpose of the investigation to be one affecting the respondent, pursuant to the provisions of §§ 9 and 11 (c), "regarding complaints of violations by said company of Sections 6, 7, 11 (c), 15 (a) (1), 15 (a) (2) and 15 (a) (5) of the Act." Cf. the authorities cited in notes 32 and 45.

more than meet the requirements long established by many precedents.

More recent confirmation of those rulings may be found in *Endicott Johnson Corp.* v. *Perkins, supra,* and *Myers* v. *Bethlehem Corp.,* 303 U. S. 41. It is true that these cases involved different statutes substantially and procedurally. But, notwithstanding the possible influence of the doctrine of governmental immunity to suit in the *Endicott Johnson* case, it would be anomalous to hold that under the Walsh-Healey Act, 49 Stat. 2036, the district court was not authorized to decide the question of coverage or, on the basis of its adverse decision, to deny enforcement to the Secretary's subpoena seeking relevant evidence on that question, because Congress had committed its initial determination to him; and at the same time to rule that Congress could not confer the same power upon the Administrator with reference to violations of the Fair Labor Standards Act.[49] The question at issue is not in either case the nature of the legal obligation, violation of which the evidence is sought to show. It is rather whether evidence relevant to the violation, whatever the obligation's character, can be drawn forth by the exercise of the subpoena power.

The *Myers* case did not involve a *subpoena duces tecum,* but was a suit to enjoin the National Labor Relations Board from holding a hearing upon a complaint against an employer alleged to be engaged in unfair labor practices forbidden by the Wagner Act, 49 Stat. 449. The hearing required an investigation and determination of coverage, involving as in this case the question whether the company was engaged in commerce. It denied this upon allegations thought to sustain the denial, as well as

---

[49] This Court, in granting certiorari in the *Endicott Johnson* case, did so, among other reasons, "because of probable conflict with" *General Tobacco & Grocery Co.* v. *Fleming,* 125 F. 2d 596, a case arising under the Fair Labor Standards Act. 317 U. S. at 502.

the futility, expensiveness and vexatious character of the hearing to itself.[50] This Court held that the district court was without jurisdiction to enjoin the hearing. Regarding as appropriate the procedure before the Board and as adequate the provisions for judicial review of its action, including its determination of coverage, the Court sustained the exclusive jurisdiction of the Board, and of the court of appeals upon review, to determine that question, with others committed to their judgment, in the statutory proceeding for determining whether violations of the Act exist. The opinion referred to the Board's subpoena power, also to its authority to apply to a district court for enforcement, and stated that "to such an application appropriate defence may be made." But the decision's necessary effect was to rule that it was not "an appropriate defence" that coverage had not been determined prior to the hearing or, it would seem necessarily to follow, prior to the Board's preliminary investigation of violation. If this is true in the case of the Board, it would seem to be equally true in that of the Administrator.[51]

---

[50] To the argument of "irreparable damage," the Court said: "The contention is at war with the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. . . . Obviously, the rule . . . cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage. Lawsuits also often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact." 303 U. S. at 50.

[51] It is true that in the *Myers* situation the Board's determination is quasi-judicial, is given finality as to the facts if there is evidence to sustain its findings, National Labor Relations Act, § 10 (e) (49 Stat. 454), and is expressly made exclusive, *ibid.*, § 10 (a), whereas in the situations now presented the Administrator's investigation is only preliminary to instituting proceedings in court and thus has none of the finality or quasi-judicial character given to the Board's determi-

In these results under the later as well as the earlier decisions, the basic compromise has been worked out in a manner to secure the public interest and at the same time to guard the private ones affected against the only abuses from which protection rightfully may be claimed. The latter are not identical with those protected against invasion by actual search and seizure, nor are the threatened abuses the same. They are rather the interests of men to be free from officious intermeddling, whether because irrelevant to any lawful purpose or because unauthorized by law, concerning matters which on proper occasion and within lawfully conferred authority of broad limits are subject to public examination in the public interest. Officious examination can be expensive, so much so that it eats up men's substance. It can be time consuming, clogging the processes of business. It can become persecution when carried beyond reason.

On the other hand, petitioners' view, if accepted, would stop much if not all of investigation in the public interest at the threshold of inquiry and, in the case of the Administrator, is designed avowedly to do so. This would render substantially impossible his effective discharge of the duties of investigation and enforcement which Congress has placed upon him. And if his functions could be thus blocked, so might many others of equal importance.

nation. But, as the Court noted, the Board also has preliminary investigative authority, incidental to preparation for the hearing, to which its subpoena power applies, National Labor Relations Act, § 11 (49 Stat. 455, 456); and, as we have said, if the courts are forbidden to determine coverage prior to the Board's quasi-judicial proceeding for deciding that question, it would seem necessarily to follow that they are forbidden also to decide it prior to the Board's preliminary investigation to determine whether the proceeding shall be instituted.

The mere fact that the first stage of formal adjudication is administrative in the one case and judicial in the other would seem to make no difference with the power of Congress to authorize either the preliminary investigation or the use of the subpoena power in aid of it.

We think, therefore, that the courts of appeals were correct in the view that Congress has authorized the Administrator, rather than the district courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations; in doing so to exercise his subpoena power for securing evidence upon that question, by seeking the production of petitioners' relevant books, records and papers; and, in case of refusal to obey his subpoena, issued according to the statute's authorization, to have the aid of the district court in enforcing it. No constitutional provision forbids Congress to do this. On the contrary, its authority would seem clearly to be comprehended in the "necessary and proper" clause, as incidental to both its general legislative and its investigative powers.

## IV.

What has been said disposes of petitioners' principal contention upon the sufficiency of the showing. Other assignments, however, present the further questions whether any showing is required beyond the Administrator's allegations of coverage and relevance of the required materials to that question; and, if so, of what character. Stated otherwise, they are whether the court may order enforcement only upon a finding of "probable cause," that is, probability in fact, of coverage, as was held by the Court of Appeals for the Tenth Circuit in No. 61, following the lead of the Eighth Circuit in *Walling* v. *Benson,* 137 F. 2d 501, or may do so upon the narrower basis accepted by the Third Circuit in No. 63.

The showing in No. 61 was clearly sufficient to constitute "probable cause" in this sense under conceptions of coverage prevailing at the time of the hearing,[52] whether

[52] The evidence that the company or its employees were engaged in commerce, etc., was supplied largely by it in the return to the rule to show cause and the supporting affidavits, consisting of admissions

or not that showing was necessary. Accordingly the judgment in that case must be affirmed.

In No. 63 the showing was less extensive, and it is doubtful that it would constitute "probable cause" of coverage as that term was used in the decisions from the Tenth and Eighth Circuits.[53] The Court of Appeals for the Third Circuit did not so label it, but held the showing sufficient.

Congress has made no requirement in terms of any showing of "probable cause"; [54] and, in view of what has already been said, any possible constitutional requirement

and statements of fact concerning its modes of doing business. The admissions obviously were made upon petitioner's broad theory that the publishing business is not subject to the Act or to the commerce power. But those conclusions do not nullify the factual character of the admissions and, so taken, they adequately sustain the appellate court's conclusion of "probable cause" of coverage.

[53] See notes 3, 4. The Administrator's allegations, more general than in No. 61, merely set forth that the company was a newspaper publisher, that the Administrator had reason to believe it was violating the Act, and that it was "engaged in commerce and in the production of goods for commerce." This conclusion was denied. The admissions of the return, including the affidavits, supplied only the pertinent facts in relation to coverage that the respondent, News Printing Co., was engaged in the business of publishing and distributing the "Paterson Evening News," a daily paper, that less than one per cent of its circulation of more than 23,000 copies, or a daily average of 278 copies, was distributed outside New Jersey, where the paper was published, and that the business was conducted in the same manner as other "local" papers according to the methods shown by the affidavits. These disclosed nothing material concerning interstate phases of such businesses generally, except as might be inferred from statements that they publish national and international as well as local news, and must do so as quickly as possible after the events occur.

[54] Section 9 of the Federal Trade Commission Act authorizes the Administrator to invoke the aid of the court "in case of disobedience to a subpoena" and the court is authorized to give assistance "in case of contumacy or refusal to obey a subpoena issued to any corporation or other person . . ." Cf. note 24.

of that sort was satisfied by the Administrator's showing in this case, including not only the allegations concerning coverage, but also that he was proceeding with his investigation in accordance with the mandate of Congress and that the records sought were relevant to that purpose. Actually, in view of today's ruling in *Mabee* v. *White Plains Publishing Co., supra,* the showing here, including the facts supplied by the response, was sufficient to establish coverage itself, though that was not required.

The result therefore sustains the Administrator's position that his investigative function, in searching out violations with a view to securing enforcement of the Act, is essentially the same as the grand jury's, or the court's in issuing other pretrial orders for the discovery of evidence,[55] and is governed by the same limitations. These are that he shall not act arbitrarily or in excess of his statutory authority, but this does not mean that his inquiry must be "limited . . . by forecasts of the probable result of the investigation . . ." *Blair* v. *United States,* 250 U. S. 273, 282; cf. *Hale* v. *Henkel,* 201 U. S. 43. Nor is the judicial function either abused or abased, as has been suggested,[56] by leaving to it the determination of the

---

[55] The bill of discovery in equity would seem to furnish an instance. Cf. *Sinclair Refining Co.* v. *Jenkins Petroleum Co.,* 289 U. S. 689, 696–697. See also the provisions for pretrial examination and the taking of depositions, Federal Rules of Civil Procedure, Rules 26 (b), 30 (d), 45; *Union Central Life Ins. Co.* v. *Burger,* 27 F. Supp. 556; *Bloomer* v. *Sirian Lamp Co.,* 4 F. R. D. 167, 8 F. R. S. 26b.31, Case 3; *Lewis* v. *United Air Lines Transport Corp.,* 27 F. Supp. 946, 947. The power of Congress itself to call for information presents a related illustration. *McGrain* v. *Daugherty,* 273 U. S. 135, 156–158.

[56] In *General Tobacco & Grocery Co.* v. *Fleming,* 125 F. 2d 596, 599, the court said: "In the exercise of the judicial power to review questions of law, as conferred by an Act of Congress, the seal of a United States Court should not become a mere rubber stamp for the approval of arbitrary action by an administrative agency." In this case, No. 63, the district court said: ". . . the functions of the Courts remain, and those functions are not merely to act as an adjunct of administrative bodies. . . ." 49 F. Supp. 659, 661.

important questions which the Administrator's position concedes the courts may decide.[57]

Petitioners stress that enforcement will subject them to inconvenience, expense and harassment. That argument is answered fully by what was said in *Myers* v. *Bethlehem Corp.*[58] There is no harassment when the subpoena is issued and enforced according to law. The Administrator is authorized to enter and inspect, but the Act makes his right to do so subject in all cases to judicial supervision. Persons from whom he seeks relevant information are not required to submit to his demand, if in any respect it is unreasonable or overreaches the authority Congress has given. To it they may make "appropriate defence" surrounded by every safeguard of judicial restraint. In view of these safeguards, the expressed fears of unwarranted intrusions upon personal liberty are effective only to recall Mr. Justice Cardozo's reply to the same exaggerated forebodings in *Jones* v. *Securities & Exchange Commission:* "Historians may find hyperbole in the sanguinary simile." [59]

Nor is there room for intimation that the Administrator has proceeded in these cases in any manner contrary to

[57] The issues of authority to conduct the investigation, relevancy of the materials sought, and breadth of the demand are neither minor nor ministerial matters. Nor would there be any failure to satisfy fully the discretionary power implied in the statute's use of the word "may," rather than "shall," see note 24, in authorizing the court to enforce the subpoenas. It would be going far to say that Congress could not proceed upon this basis, but could go forward only by requiring a showing of probable cause of coverage in the sense of probability in fact of coverage. Cf. note 44 and text. Coverage is but one element in violation and if probable cause, in that sense, must be shown concerning it, it is difficult to understand why probable cause must not be shown also concerning exemptions, see *Martin Typewriter Co.* v. *Walling*, 135 F. 2d 918; *Walling* v. *La Belle S. S. Co.*, 148 F. 2d 198, or any other essential element in violation.

[58] See note 50 *supra*.

[59] See note 30.

petitioners' fundamental rights or otherwise than strictly according to law. It is to be remembered that petitioners' are not the only rights which may be involved or threatened with possible infringement. Their employees' rights and the public interest under the declared policy of Congress also would be affected if petitioners should enjoy the practically complete immunity they seek.

No sufficient reason was set forth in the returns or the accompanying affidavits for not enforcing the subpoenas, a burden petitioners were required to assume in order to make "appropriate defence."

Accordingly the judgments in both causes, No. 61 and No. 63, are

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

MR. JUSTICE MURPHY, dissenting.

It is not without difficulty that I dissent from a procedure the constitutionality of which has been established for many years. But I am unable to approve the use of non-judicial subpoenas issued by administrative agents.

Administrative law has increased greatly in the past few years and seems destined to be augmented even further in the future. But attending this growth should be a new and broader sense of responsibility on the part of administrative agencies and officials. Excessive use or abuse of authority can not only destroy man's instinct for liberty but will eventually undo the administrative processes themselves. Our history is not without a precedent of a successful revolt against a ruler who "sent hither swarms of officers to harass our people."

Perhaps we are too far removed from the experiences of the past to appreciate fully the consequences that may result from an irresponsible though well-meaning use of

the subpoena power. To allow a non-judicial officer, unarmed with judicial process, to demand the books and papers of an individual is an open invitation to abuse of that power. It is no answer that the individual may refuse to produce the material demanded. Many persons have yielded solely because of the air of authority with which the demand is made, a demand that cannot be enforced without subsequent judicial aid. Many invasions of private rights thus occur without the restraining hand of the judiciary ever intervening.

Only by confining the subpoena power exclusively to the judiciary can there be any insurance against this corrosion of liberty. Statutory enforcement would not thereby be made impossible. Indeed, it would be made easier. A people's desire to cooperate with the enforcement of a statute is in direct proportion to the respect for individual rights shown in the enforcement process. Liberty is too priceless to be forfeited through the zeal of an administrative agent.