**NATIONAL LABOR RELATIONS BOARD, Applicant,**

v.

**UNITED AIRCRAFT CORPORATION (PRATT & WHITNEY DIVISION AND HAMILTON STANDARD DIVISION) et al., Respondents.**

Civ. No. 9070.

United States District Court
D. Connecticut.

Dec. 15, 1961.

Allan I. Mendelsohn, Harold M. Kowal, Washington, D. C., Norman Zankel, Boston, Mass., Marcel Mallet-Prevost, Washington, D. C., for petitioner.

Charles A. Mahan, East Hartford, Conn., Joseph C. Wells, Washington, D. C., for respondents.

CLARIE, District Judge.

This case is before the court on application by the National Labor Relations Board, pursuant to Section 11(2) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., for an order requiring United Aircraft Corporation (Pratt & Whitney Division and Hamilton Standard Division), a Delaware corporation having an office and transacting business within the jurisdiction of this court, to comply with two subpoenas duces tecum of the National Labor Relations Board issued in the course of an investigation, instituted to ascertain whether the corporation had violated Sections 8(a) (1), (3) and (5) of the Act.

The relevant facts are as follows: In June of 1960, Lodges 1746 and 743 of

the International Association of Machinists commenced a strike against the Respondent. The strike was ultimately terminated by a settlement agreement which provided the following method for recall of strikers: (1) If the job held prior to the strike was available, the striker would be returned to the job. (2) If such job was not available, the strikers were to be recalled to other available jobs in their occupational groups and seniority areas in accordance with a contract then in force between the Union and the Respondent. (3) Strikers for whom no jobs were available were to be placed on a "Preferred Hiring List" and were to be recalled to job openings in their occupational groups and seniority areas which might develop prior to January 1, 1961.

Beginning on November 21, 1960 and continuing through September 1961, the Union and various individual employees filed charges with the National Labor Relations Board alleging that because of their membership in the Union the Respondent had discriminated against them by withholding employment and/or by failing to reinstate various employees to their rightful jobs; that Respondent had caused a loss of pay and reinstatement rights by working excessive hours of overtime in various departments; that various individuals were recalled to less desirable jobs than those to which they were entitled and that there had been, in general, discriminatory treatment directed against specific individuals in violation of Section 8(a) (3) of the Act. The Union represents bargaining units comprising about 22,500 of the Respondent's employees and the charges relate to more than 700 individual employees.

An investigation of the charges was undertaken by the Regional Office of the Board and certain information was requested from the Respondent for the purpose of determining whether a complaint should issue on the charges. Respondent refused to furnish the information, whereupon the subpoenas involved here were issued. Respondent filed with the

Board a motion to revoke the subpoenas; the Board denied the motion, together with Respondent's subsequent motion for reconsideration. Respondent still refuses to furnish the information in the areas and form requested by the Board.

The subpoenas demand the following documents, (a) the employment application of each employee hired into the bargaining units of the Union between January 1, 1961 and May 1, 1961; (b) records indicating the occupational code, seniority area, department number, and date of hire for each employee hired into the bargaining unit during the four month period, if such information is not already indicated on the employment application; (c) lists indicating, as to each employee hired into the bargaining unit during this period, whether or not he was a "direct factory employee"; (d) documents indicating the name, occupational code, seniority area and department number of each employee who registered for reinstatement after the strike and who had not been recalled to active employment as of December 31, 1960; (e) documents indicating the specific occupational classifications which comprise the group of "direct factory employees"; (f) documents indicating which departments by name or number that performed overtime work during the January to May period.

Respondent bases his refusal to comply with the subpoenas on two main grounds, (1) that the records and other information sought in the subpoenas are irrelevant and immaterial to the issues under investigation and the proceeding before the Board and (2) that the subpoenas are unlawful and improper.

■ The National Labor Relations Act confers broad powers of investigation on the Board. They have the power to subpoena any evidence "that relates to any matter under investigation or in question".[1] Congress, however, did not see fit to empower the Board with the power to commit for contempt and provided instead that the Board may apply

1. Section 11(1) of the National Labor Relations Act.

to the appropriate District court for an order enforceable by contempt proceedings.[2] A proceeding for judicial enforcement of a subpoena involves more than an automatic issuance of the order and it has been held by the Supreme Court that such a proceeding is a "case" or "controversy."[3]

This court may, as respondent, contends consider the breadth of the subpoena and the relevancy of the matter sought by it.[4] Respondent, also, contends that the Board by seeking the requested information is engaged in a "vast fishing expedition." While it is true that "fishing expeditions into private papers on the possibility that they may disclose evidence of crime" are strongly condemned in the older cases,[5] the Supreme Court in more recent cases has modified its position.[6]

For example in United States v. Morton Salt Co., 338 U.S. 632, 642, 643, 70 S.Ct. 363, 364, (1950) the court said,

"We must not disguise the fact that sometimes, especially early in the history of the federal administrative tribunal, the courts were persuaded to engraft judicial limitations upon the administrative process. The courts could not go fishing, and so it followed neither could anyone else. Administrative investigations fell before the colorful and nostalgic slogan 'no fishing expeditions.' * * *

"The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. * * * It is * * * analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law."

■ The only limitations that are placed on administrative investigations are that the agency may not act arbitrarily or in excess of its statutory authority.[7] The Board's investigation of the matter requested may not be of such a sweeping nature and so unrelated to the matter under inquiry as to exceed their investigatory power.[8]

This court does not feel that the information sought by these subpoenas is so plainly irrelevant as to exceed the Board's

---

2. Section 11(2) of the National Labor Relations Act.

3. Interstate Commerce Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894); Davis, Administrative Law § 37, at 123 (1951).

4. Brown v. United States, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500 (1928); F. T. C. v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786 (1924); Davis, Administrative Law § 37, at 123 (1951).

5. F. T. C. v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786 (1924); Davis, Administrative Law § 33, at 109 (1951).

6. United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950); Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531 (1946); Davis, Administrative Law § 33 (1951).

7. Oklahoma Press Pub. Co. v. Walling, supra note 6, 327 U.S. at 216.

8. United States v. Morton Salt Co., 338 U.S. 632, 652, (1950) 70 S.Ct. 357; "the evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose * * * under the Act * * *.". Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1942).

investigatory powers. On the contrary, the Board was acting well within the limits of its authority in issuing the subpoenas and the evidence sought is relevant.

 The employment applications and other information in regard to new employees hired during the period when the alleged discrimination was practiced is not only relevant but necessary for a determination of whether there was in fact discrimination against strikers. Similarly, information, in regard to "direct factory employees" and the amount of overtime worked is also relevant, when considered in light of the fact that the Board has data from other sources[9] indicating that during January 1961 (the first month during which the strikers no longer enjoyed preferential hiring) there was a great increase in the number of direct factory employees and that Respondent incurred greater overtime expenses for the early months of 1961 than it did for like months in 1960, even though in 1961 it had several hundred strikers still desiring recall. The charges allege that the Respondent withheld employment from strikers and denied reinstatement to them. One of the devices allegedly used to do this was to operate on an overtime basis so fewer jobs for unrecalled strikers would be available.

Respondent, repeatedly, states that it has offered to make available to the Board, employment records pertaining to strikers named in the charges and other company records. A person or corporation being investigated cannot be placed in a position of giving only such information as he or it may choose to offer. Usually it is the information which is not offered, that forms the basis for scrutiny when illegal practices are in question.

It is, also, noted that the Board's subpoenas are limited in their scope to employees hired during a particular period and to the Respondent's activities during a particular period and do not cover all of Respondent's employees as did one of the items requested in Goodyear Tire & Rubber Co. v. N. L. R. B., 122 F.2d 450 (6th Cir. 1941), a case which Respondent relies heavily upon.

 Finally, Respondent urges that the Board's requests are unreasonably burdensome and that they will require the production of thousands of documents. While it may be true that these subpoenas will require the production of a large number of records and documents, it must be remembered that this investigation involves complaints by a substantial number of union members. The mere size of Respondent's operation is no excuse for its refusal to give information relative to possible unfair labor practices. It is presumed, by the very fact that Respondent has such a large number of employees, that it is sufficiently equipped to handle the records of its employees. Respondent's personnel offices are, admittedly, equipped with electronic office machines through which many of the documents requested could be readily processed. In any event, Respondent has not demonstrated that the furnishing of the requested records and documents would place such an unreasonable burden on it so as to be oppressive.[10]

To avoid placing the Respondent in an unreasonable situation, wherein its normal personnel operations might be inter-

---

9. In a letter (referred to by counsel for the Board) which the Comptroller General of the United States wrote to Congressman Kowalski, the Comptroller General cited statistics from United Aircraft' Corporation's record indicating that during January 1961 the increase in the number of direct factory employees was nearly as large as the increase for the four previous months combined and that the Respondent incurred greater overtime expenses for the early months of 1961 than it did for the like months of 1960.

10. There was no evidence offered at the hearing by either party. There was incorporated by reference the correspondence from the Board to the Respondent dated August 9, 1961, and the reply dated August 30, 1961, together with a copy of the strike settlement agreement, dated August 11, 1960.

rupted, it is ordered that the records and documents be inspected at a convenient location upon the premises of the United Aircraft Corporation rather than at a location designated by the Board. In all other regards the application of the National Labor Relations Board is granted and an order issued accordingly setting the compliance date for said order on or before January 15, 1962.