IN THE MATTER OF THE RIGHT OF THE GRAND JURY
TO ORDER PRODUCTION OF RECORDS OF HUGH J.
ADDONIZIO.

Argued October 21, 1968—Decided December 16, 1968.

108

110

*Mr. Bernard Hellring* argued the cause for appellant Addonizio (*Mr. Edwin H. Stern,* on the brief; *Messrs. Hellring, Lindeman and Landau,* attorneys).

*Mr. Michael F. Riccardelli,* Assistant Prosecutor, argued the cause for respondent (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J., Two orders are involved on this appeal. A subpoena was issued to appellant, Hugh J. Addonizio, to produce certain records before a grand jury. He refused to comply, except in an insignificant aspect, asserting the Fourth, Fifth, and Fourteenth Amendments to the Federal Constitution. His objections were overruled and an order was entered directing obedience to the subpoena. That order is here under review. The second order denied a motion by Addonizio and his wife to set aside grand jury subpoenas served upon a bank and a brokerage firm for the production of their accounts with them and also for disclosure by the bank as to the existence of safe deposit boxes in their names.

The Appellate Division allowed leave to appeal and we certified the matters before they were heard by that court.

For the reasons which follow we find the subpoena to Addonizio must be set aside but the trial court correctly upheld the subpoenas to the bank and the brokerage firm.

The grand jury had been charged by the Assignment Judge to investigate allegations of official corruption in the City of Newark. Addonizio is the Mayor of the City and has held that office since 1962. Addonizio did not challenge the validity of the basic inquiry, and in fact directed all city personnel to cooperate fully with respect to official records. But as to his personal records and the records of private institutions which reflect transactions with him, Addonizio pressed the constitutional objections to which we now turn.

I

We will deal first with Addonizio's Fifth Amendment objection to the subpoena upon him to produce his own records. The subpoena calls for the following:

"1. Checking account statement

2. Deposit slips

3. Cancelled checks

4. Check books and check stubs

5. Savings account books

6. Income Tax returns

7. List of securities and/or bonds held

8. Statements of account from brokerage houses, investment clubs, mutual funds or any other source for the purchase of securities and/or bonds.

9. List of all real and personal property together with the location of same, date of purchase, purchase price, date of disposition, disposition price, and the name in which same is held.

10. List of all partnerships, corporations, or joint ventures in which you have an interest together with financial statements of such entities."

The State said below that it intended a time limitation, *i. e.*, the period of Addonizio's incumbency as Mayor of the City, and asked that the subpoena be so understood. This limitation did not, however, obviate the objection. Addonizio produced only recorded deeds and mortgages relating to his homes and a statement of his public salary as Mayor. In short, he revealed only what was already a matter of public record.

As to the Fifth Amendment, Addonizio sufficiently stated his belief that the subpoenaed records would tend to incriminate him with respect to some crime constituting corruption in public office. The trial court held, however, that Addonizio failed to reveal a basis for that belief. As to this Addonizio contended (1) that under *L.* 1968, *c.* 195 (*N. J. S.* 2*A* :81–17.3), a mere assertion of the privilege against self-incrimination bars any inquiry unless the Attorney General, or the prosecutor with the approval of the Attorney General, asks the court to compel an answer, and (2) that in any event a sufficient basis for the plea was revealed.

As to the first proposition, we quote the statute in full:

"In any criminal proceeding before a court or grand jury, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby and if the Attorney General or the county prosecutor with the approval of the Attorney General, in writing, requests the court to order that person to answer the question or produce the evidence, the court shall so order and that person shall comply with the order. After complying and if but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, *such testimony or evidence may not be used against the person in any proceeding or prosecution for a crime or offense concerning which he gave answer or produced evidence under court order.* However, he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order. If a person refuses to testify after being granted immunity from prosecution and after being ordered to testify as aforesaid, he may be adjudged in contempt and committed to the county jail until such time as he purges himself of contempt by testifying as ordered without regard to the expiration of the grand jury; provided, however, that if the grand jury before

which he was ordered to testify has been dissolved, he may then purge himself by testifying before the court."

The bill, which became this law, had been patterned after the Model State Witness Immunity Act but was amended by substituting the italicized language for the following provision of the Model Act[1]:

"* * * that person shall not be prosecuted or subjected to penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order, he gave answer or produced evidence."

Referring first to the Model Act, we think it clear that under it the claim of privilege must be passed upon and upheld by the court before immunity need be offered. We so read the Commissioners' Prefatory Note, 9C *Uniform Laws Ann.* 189. The reason is plain. It would be an invitation to obstruction if whenever a reluctant witness intoned the naked words of the constitutional privilege, a trial or other hearing had to be suspended and so remain until the Attorney General acquainted himself with the matter and decided upon immunity. Moreover, the Attorney General is better situated to decide whether immunity should be granted when the witness gives some indication of the matters upon which immunity is sought. A contrary result is not

---

[1] The substituted language in the statute as enacted was doubtless employed upon the thesis that immunity from prosecution need not be given and that immunity from the use of the coerced evidence and its fruits satisfies the Fifth Amendment privilege. See *Murphy v. Waterfront Commission*, 378 U. S. 52, 84 S. Ct. 1594, 12 L. Ed. 2d 678 (1964); *Stevens v. Marks*, 383 U. S. 234, 244-245, 86 S. Ct. 788, 15 L. Ed. 2d 724, 731-732 (1966); *Gardner v. Broderick*, 392 U. S. 280, 88 S. Ct. 1920, 20 L. Ed. 2d 1082 (1968); *cf. State v. De-Cola*, 33 N. J. 335, 352-354 (1960). The validity of that thesis is not here involved. On the contrary, Addonizio invokes the statute, and we contrast its provisions with those of the Model Act only insofar as the difference could arguably bear upon Addonizio's claim that the statute operates the moment a witness asserts the privilege and does so without inquiry at that juncture into whether there is in truth a basis for the claim of privilege.

suggested, as Addonizio contends, by so much of the Model Act as makes the immunity from prosecution depend ultimately upon whether the privilege against self-incrimination was in truth available when it was claimed. That provision doubtless appears because a spurious claim of privilege could get by on a preliminary hearing and hence the grant of immunity from prosecution should be voided if it later appears the evidence the witness revealed was not incriminating at all.

■ We think the same conclusion is required of our statute as adopted even though an immunity from use of the evidence was substituted for the Model Act's immunity from prosecution. The reasons are the same. It is equally evident that the Legislature would not want to permit false or frivolous interruption of trials and hearings. And although immunity from use of evidence is less than an immunity from prosecution, still it is sound to require the witness to make a claim of privilege the court finds sufficient. Such a disclosure may aid the Attorney General in deciding whether the testimony which the witness can supply is worth the immunity in practical effect which the witness may receive if the State should be unable to show it obtained evidence of the witness's guilt from independent sources. Thus there is ample reason to retain the thesis of the Model Act that the claim of privilege must be examined by the trial court as heretofore, and that that statute comes into play only if the court finds a basis for the claim. The trial court was correct in taking that view of the act.

■ But we think Addonizio's claim of privilege must be upheld. It is true a witness may not make himself the final judge of the availability of the Fifth Amendment privilege and hence enough must appear to permit the court to pass upon it, see *Hoffman v. United States,* 341 *U. S.* 479, 486–487, 71 *S. Ct.* 814, 95 *L. Ed.* 1118, 1124 (1951); *Malloy v. Hogan,* 378 *U. S.* 1, 11–12, 84 *S. Ct.* 1489, 12 *L. Ed.* 2d 653, 661–662 (1964); *In re Pillo,* 11 *N. J.* 8, 19–20 (1952); *State v. De Cola,* 33 *N. J.* 335, 350–352

(1960); *In re Boiardo,* 34 *N. J.* 599, 602 (1961); *In re Boyd,* 36 *N. J.* 285 (1962), and accordingly when the privilege is asserted with respect to records, the witness must produce them so that the court may determine whether the claim is spurious, *Consolidated Rendering Co. v. Vermont,* 207 *U. S.* 541, 552–553, 28 *S. Ct.* 178, 52 *L. Ed.* 327, 335 (1908). And it is true that Addonizio made no effort to come within those cases. But it is evident that Addonizio is himself the target of the grand jury's investigation, for it is inconceivable that the records of Addonizio could reveal criminality upon the part of others without also implicating him. When a witness is thus a target of the grand jury's inquiry, no more need appear to support his Fifth Amendment claim. We so held in *State v. De Cola,* *supra,* 33 *N. J.,* at 341–342; and see also *In re Boiardo,* *supra,* 34 *N. J.,* at 604–606.

## II

### A.

Addonizio's refusal to produce his records having been sustained under the Fifth Amendment, it is unnecessary to consider his further reliance upon the Fourth Amendment. However, the Fourth Amendment is involved in the attack on the subpoenas of the bank and the brokerage firm and since a discussion of Addonizio's Fourth Amendment claim with respect to the subpoena served upon him will serve equally to resolve the challenge to the subpoenas upon the bank and the brokerage firm, we will deal with his contention that the subpoena directed to him also violates the Fourth Amendment.

The Fourth Amendment reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The much mooted case, *Boyd v. United States*, 116 *U. S.* 616, 6 *S. Ct.* 524, 29 *L. Ed.* 746 (1886), involved a statute under which a defendant in a forfeiture suit was required to produce papers upon court order in default of which the allegations of the complaint would be deemed admitted and the forfeiture would ensue. All members of the Court agreed the statute violated the Fifth Amendment ban against compulsory self-incrimination, but the Court divided upon the Fourth Amendment issue, the majority finding that it too was infringed while the others could see no search or seizure at all. That case established the proposition that a subpoena duces tecum comes within the Fourth Amendment.

Since then a myriad of cases have sought the precise impact of the Fourth Amendment upon a subpoena duces tecum. At times the inquiry seemed confused by a tendency to assume the demands of the Fourth with respect to a search and seizure under a search or arrest warrant apply equally to a subpoena duces tecum. It is now clear that this is not so, and that what is "unreasonable" in the case of search and seizure is not the measure of what is "unreasonable" in the case of a subpoena duces tecum; that the "probable cause" required for a search or arrest warrant is very different from the "probable cause" required to support the subpoena; and that the specificity required of a search warrant is not applicable to it. In short, the demands and restraints of the Fourth vary with the varying interests, private and public, in these settings.

A clear exposition is found in *Oklahoma Press Publishing Co. v. Walling*, 327 *U. S.* 186, 66 *S. Ct.* 494, 90 *L. Ed.* 614 (1946). Involved was a subpoena duces tecum issued by the Wage Hour Administrator to an employer in the course of his investigation with respect to compliance with the Fair Labor Standards Act. The subpoenaed records related to whether the act covered the employer and also to whether the employer had obeyed the statute. The employer challenged the subpoena for want of "probable cause." The objection

was overruled. Affirming, the Supreme Court said in a discourse revealing also as to a grand jury investigation (327 *U. S.,* at 208–209, 66 *S. Ct.,* at 505, 90 *L. Ed.,* at 629–630):

"Without attempt to summarize or accurately distinguish all of the cases, the fair distillation, in so far as they apply merely to the production of corporate records and papers in response to a subpoena or order authorized by law and safe-guarded by judicial sanction, seems to be that the Fifth Amendment affords no protection by virtue of the self-incrimination provision, whether for the corporation or for its officers; and the Fourth, if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.

As this has taken form in the decisions, the following specific results have been worked out. It is not necessary, as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. It is enough that the investigation be for a lawfully authorized purpose, within the power of Congress to command. This has been ruled most often perhaps in relation to grand jury investigations, but also frequently in respect to general or statistical investigations authorized by Congress. The requirement of 'probable cause, supported by oath or affirmation' literally applicable in the case of a warrant is satisfied, in that of an order for production by the court's determination that the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry. Beyond this the requirement of reasonableness, including particularity in 'describing the place to be searched, and the persons or things to be seized,' also literally applicable to warrants, comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, as has been said, this cannot be reduced to formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry."

It continued (327 *U. S.,* at 213, 66 *S. Ct.,* at 508, 90 *L. Ed.,* at 632):

"In these results under the later as well as the earlier decisions, the basic compromise has been worked out in a manner to secure the public interest and at the same time to guard the private ones af-

fected against the only abuses from which protection rightfully may be claimed. The latter are not identical with those protected against invasion by actual search and seizure, nor are the threatened abuses the same. They are rather the interests of men to be free from officious intermeddling, whether because irrelevant to any lawful purpose or because unauthorized by law, concerning matters which on proper occasion and within lawfully conferred authority of broad limits are subject to public examination in the public interest. Officious examination can be expensive, so much so that it eats up men's substance. It can be time consuming, clogging the processes of business. It can become persecution when carried beyond reason.

On the other hand, petitioners' view if accepted would stop much if not all of investigation in the public interest at the threshold of inquiry and, in the case of the Administrator, is designed avowedly to do so. This would render substantially impossible his effective discharge of the duties of investigation and enforcement which Congress has placed upon him. And if his functions could be thus blocked, so might many others of equal importance."

And we note, finally, the following (327 *U. S.*, at 216–217, 66 *S. Ct.*, at 509, 90 *L. Ed.*, at 634) :

"The result therefore sustains the Administrator's position that his investigative function, in searching out violations with a view to securing enforcement of the Act, is essentially the same as the grand jury's, or the court's in issuing other pretrial orders for the discovery of evidence, and is governed by the same limitations. These are that he shall not act arbitrarily or in excess of his statutory authority, but this does not mean that his inquiry must be 'limited * * * by forecasts of the probable result of the investigation * * *' Blair v. United States, 250 U. S. 273, 282, 39 S. Ct. 468. 471, 63 L. Ed. 979 [983] ; cf. Hale v. Henkel, 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 652. * * *"

In *United States v. Morton Salt Co.*, 338 *U. S.* 632, 70 *S. Ct.* 357, 94 *L. Ed.* 401 (1950), the Federal Trade Commission sought to determine whether the defendants had complied with court judgments enforcing the Commission's cease and desist order. The Court found it was within the statutory authority of the Commission thus to concern itself with compliance with the judicial judgment. The Court again dealt with the situation in terms revealing as to a grand jury investigation and indeed with specific reference to it, saying

(338 *U. S.,* at 641–643, 70 *S. Ct.,* at 363, 94 *L. Ed.,* at 410–411):

"This case illustrates the difference between the judicial function and the function the Commission is attempting to perform. The respondents argue that since the Commission made no charge of violation either of the decree or the statute, it is engaged in a mere 'fishing expedition' to see if it can turn up evidence of guilt. We will assume for the argument that this is so. Courts have often disapproved the employment of the judicial process in such an enterprise. Federal judicial power itself extends only to adjudication of cases and controversies and it is natural that its investigative powers should be jealously confined to these ends. The judicial subpoena power not only is subject to specific constitutional limitations, which also apply to administrative orders, such as those against self-incrimination, unreasonable search and seizure, and due process of law, but also is subject to those limitations inherent in the body that issues them because of the provisions of the Judiciary Article of the Constitution.

We must not disguise the fact that sometimes, especially early in the history of the federal administrative tribunal, the courts were persuaded to engraft judicial limitations upon the administrative process. The courts could not go fishing, and so it followed neither could anyone else. Administrative investigations fell before the colorful and nostalgic slogan 'no fishing expeditions.' It must not be forgotten that the administrative process and its agencies are relative newcomers in the field of law and that it has taken and will continue to take experience and trial and error to fit this process into our system of judicature. More recent views have been more tolerant of it than those which underlay many older decisions. Compare Jones v. Securities & Exchange Comm[ission], 298 U. S. 1, 56 S. Ct. 654, 80 L. Ed. 1015, with United States v. Morgan, 307 U. S. 183, 191, 59 S. Ct. 795, 799, 83 L. Ed. 1211, [1217].

The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. *It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.* When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law." (Emphasis added.)

More recently, in *United States v. Powell,* 379 *U. S.* 48, 85 *S. Ct.* 248, 13 *L. Ed. 2d* 112 (1964), which involved an internal revenue investigation, the Court rejected the proposition that the agency should be denied judicial aid unless it can show a basis to believe the taxpayer filed a fraudulent return. The Court reaffirmed the principles of *Oklahoma Press Publishing Co.* and *Morton Salt Co.* with their analogy to the grand jury inquiry, saying (379 *U. S.,* at 57, 85 *S. Ct.,* at 254, 13 *L. Ed. 2d,* at 119) :

"This view of the statute is reinforced by the general rejection of probable cause requirements in like circumstances involving other agencies. In Oklahoma Press Pub. Co. v. Walling, 327 U. S. 186, 216, 66 S. Ct. 494, 509, 90 L. Ed. 614 [634], 166 A. L. R. 531, in reference to the Administrator's subpoena power under the Fair Labor Standards Act, the Court said 'his investigative function, in searching out violations with a view to securing enforcement of the Act, is essentially the same as the grand jury's, or the court's in issuing other pretrial orders for the discovery of evidence, and is governed by the same limitations,' and accordingly applied the view that inquiry must be ' "limited * * * by forecasts of the probable result of the investigation." ' In United States v. Morton Salt Co., 338 U. S. 632, 642–643, 70 S. Ct. 357, 364, 94 L. Ed. 401 [411], the Court said of the Federal Trade Commission, 'It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' "

While recognizing that it is the court's process which is being invoked to enforce the administrative summons and that a court will not permit its process to be abused, the opinion placed the burden on the subpoenaed person to show such abuse and limited the objection in these terms (379 *U. S.,* at 58, 85 *S. Ct.,* at 255, 13 *L. Ed. 2d,* at 120) :

"* * * Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the tax-

payer, and it is not met by a mere showing, as was made in this case, that the statute of limitations for ordinary deficiencies has run or that the records in question have already been once examined."

We refer also to *Camara v. Municipal Court,* 387 *U. S.* 523, 87 *S. Ct.* 1727, 18 *L. Ed. 2d* 930 (1967), and *See v. City of Seattle,* 387 *U. S.* 541, 87 *S. Ct.* 1737, 18 *L. Ed. 2d* 943 (1967), because they deal with still another situation and devise for it concepts of reasonableness and of "probable cause" different from those which prevail with respect to a search warrant in criminal matters or with respect to a subpoena duces tecum in an investigation. Those cases involved administrative inspections of property to determine whether there was compliance with municipal ordinances. Although holding that search warrants must be obtained from a judicial officer, the Court in *See v. City of Seattle* said "The agency's particular demand for access will of course be measured, in terms of probable cause to issue a warrant, against a flexible standard of reasonableness that takes into account the public need for effective enforcement of the particular regulation involved," 387 *U. S.,* at 545, 87 *S. Ct.,* at 1740, 18 *L. Ed. 2d,* at 947, and hence "probable cause" need not be a belief that there is a violation in a particular building, but only a showing that because of time and circumstances it is reasonable to conduct an area-wide inspection. See *Camara v. Municipal Court, supra,* 387 *U. S.,* at 534–539, 87 *S. Ct.,* at 1733–1736, 18 *L. Ed. 2d,* at 938–941. These cases demonstrate the several meanings of the Fourth Amendment in varying settings, and hence the danger of applying indiscriminately to one area decisions involving another.

### B.

Before us, Addonzio seeks to argue that the grand jury "should be required to show some basis or 'probable cause' before being permitted to infringe upon an individual's rights and freedoms * * * and the documents subpoenaed by it should be relevant and material to criminal activities

which the Grand Jury has some reasonable basis to believe occurred." No such stance was taken below. As we noted at the outset, Addonizio did not challenge the validity of the grand jury's inquiry into official corruption. On the contrary, he directed the City's personnel to cooperate fully in the inquiry, and although his directive was limited to official records, still Addonizio thereby accepted the investigation as valid. He of course could have reversed his stand before the trial court, but he did not, and hence there was no inquiry below as to what, if anything, was needed to support the grand jury's investigation. As we shall show in a moment, we think an adequate basis nonetheless appeared, but if we were not of that view, we could not permit Addonizio to originate such a claim upon appeal. It must be assumed that a grand jury is not an officious meddler.

It never was our rule that a grand jury may explore only specific charges already made. See *State v. Magrath,* 44 *N. J. L.* 227 *(Sup. Ct.* 1882). The grand jury may investigate upon its own suggestion, and in addition to indictments for crime, it may return "presentments" upon conditions of public interest even though no violation of a penal statute is found. See *In re Presentment by Camden County Grand Jury,* 34 *N. J.* 378 (1961); *In re Camden County Grand Jury,* 10 *N. J.* 23, 65–66 (1952); *R. R.* 3:3–9.

We need not consider whether the grand jury's authority is wholly a matter of local law unrestrained by the Federal Constitution, for the federal view of a grand jury's power in criminal matters seems as broad as our own. In *Hale v. Henkel,* 201 *U. S.* 43, 26 *S. Ct.* 370, 50 *L. Ed.* 652 (1906), it was held that a grand jury is not limited to complaints already made. The Court approved of the following excerpt from a lecture by one of its former members (201 *U. S.,* at 62, 26 *S. Ct.,* at 374, 50 *L. Ed.,* at 660):

"The oath of a grand juryman—and his oath is the commission under which he acts—assigns no limits, except those marked by diligence itself, to the course of his inquiries: Why, then, should it be circumscribed by more contracted boundaries? Shall diligent in-

quiry be enjoined? And shall the means and opportunities of inquiry be prohibited or restrained?"

The Court rejected the view of some State cases that "it must be made to appear to the grand jury that there is reason to believe that a crime has been committed, and that they have not the power to institute or prosecute an inquiry on the chance that some crime may be discovered." 201 *U. S.,* at 64, 26 *S. Ct.,* at 375, 50 *L. Ed.,* at 661. The Court distinguished too those State cases where there was "the indiscriminate summoning of witnesses with no definite objective in view, and in a spirit of meddlesome inquiry," 201 *U. S.,* at 63, 26 *S. Ct.,* at 374, 50 *L. Ed.,* at 661. Acknowledging that "abuses of this power may be imagined, as if the object of the inquiry were merely to pry into the details of domestic or business life," the Court refused to deny power on that account, saying that "were such abuses called to the attention of the court, it would doubtless be alert to repress them." 201 *U. S.,* at 65, 26 *S. Ct.,* at 375, 50 *L. Ed.,* at 662.

The subject was considered again in *Blair v. United States,* 250 *U. S.* 273, 39 *S. Ct.* 468, 63 *L. Ed.* 979 (1919), which involved contempt convictions for refusing to testify before a grand jury. The Court said of the grand jury (250 *U. S.,* at 282, 39 *S. Ct.,* at 471, 63 *L. Ed.,* at 983) :

"* * * It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning. Hendricks v. United States, 223 U. S. 178, 184, 32 Sup. Ct. 313, 56 L. Ed. 394 [397]."

And as already appears above, *Powell, Morton Salt,* and *Oklahoma Press* repeated from *Blair* the view that a grand jury may not be limited by "forecasts of the probable re-

sult of the investigation," and *Morton Salt* said, and *Powell* reiterated, that a grand jury "does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."

██ Hence the "probable cause" required for a search warrant is foreign to this scene. We heretofore reached the same result with respect to a municipal investigation. *In re Tiene,* 19 *N. J.* 149, 163 (1955). Its power to investigate would be feeble indeed if the grand jury had to know at the outset everything needed to arrest a man or to invade his home. Nor would it serve the public interest to stay a probe until the grand jury reveals what it has or what it seeks. Such disclosures could defeat the inquiry and impede the apprehension of the culprit. This is one of the reasons why the law cloaks the grand jury investigation with secrecy.

██ *Morton Salt, supra,* holds that an administrative agency, charged with seeing that the statute is obeyed within the area committed to it, may, without more, inquire to be assured of compliance. A grand jury, of course, could not assume that task with respect to the vast area of criminal law. Nor would it be tolerable for a grand jury to roam without reason upon so wide a front. But very little must suffice if the grand jury is to function. It may explore an anonymous charge. So, also, a rumor. Indeed, it may be urgent that a rumor be pursued, to relieve the public of the evil if the rumor is true and the burden of the rumor if it is false. And if the investigation is to be meaningful, "Some exploration or fishing necessarily is inherent and entitled to exist in all documentary productions sought by a grand jury." *Schwimmer v. United States,* 232 *F.* 2d 855, 862–863 (8 *Cir.*), *cert.* denied, 352 *U. S.* 833, 77 *S. Ct.* 48, 1 *L. Ed.* 2d 52 (1956).

██ We repeat that the authority of a grand jury to make a criminal investigation need not be shown, and that he who asserts an abuse must prove it. No such charge was

made below. Nor does the record suggest a basis for it. On the contrary, what does appear dissipates any notion that the grand jury was officious. The county prosecutor petitioned the Assignment Judge to impanel a grand jury to conduct an investigation suggested by a finding of the Governor's Select Commission on Civil Disorder that there was "a widespread belief that Newark's government is corrupt" and that this belief was a factor beneath the serious riot which Newark had suffered. The charge to the grand jury revealed that the prosecutor had already started an investigation into all levels of the City's government. The court referred to two presentments of other grand juries in 1965 with respect to enforcement of the gambling laws in the City, and instructed the grand jury to inquire as to whether recommendations made by one of those grand juries had been met. In this connection the court noted that in March 1968 a special gambling squad was constituted but was disbanded after six weeks of activity, and charged the jury to inquire into the circumstances and reasons for disbanding the squad. Also in the record is a letter from the prosecutor to a certified public accountant retained to assist in the investigation, referring to three specific situations of alleged dollar irregularity which need not be identified in this opinion. In the light of the foregoing the authority of the grand jury to embark upon the investigation cannot be questioned.

## C.

We turn next to whether the terms of the subpoena are "unreasonable" under the Fourth Amendment. As construed by the cases discussed above, the Fourth Amendment seems to add nothing to what would be dictated by due process of law or by sound policy without regard to any constitutional compulsion. *Cf. State v. Cooper*, 2 *N. J.* 540, 556–557 (1949); *R. R.* 3:5–10(c). The authorities are assembled in *In re Grand Jury Subpoena Duces Tecum, etc.*, 203 *F. Supp.* 575 (*S. D. N. Y.* 1961). In essence, the

subpoena must not be oppressive. As summarized in *See v. City of Seattle, supra,* 387 *U. S.,* at 544, 87 *S. Ct.,* at 1740, 18 *L. Ed. 2d,* at 947, the requirement is "that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."

The subpoena to Addonizio does not breach these limits. The grand jury directed "a net worth study" of Addonizio, the evident object of which was to determine whether he received moneys beyond the yield of his salary and other legitimate sources. Addonizio's personal financial records are needed to that end, and they are relevant to an inquiry into corruption in office. The subject is such that the grand jury cannot anticipate precisely what financial entry or affair will be relevant. The papers demanded are readily identifiable, and the time period — the period of his incumbency in the office of Mayor — is appropriate. Addonizio does not say the volume is so large that an undue physical burden will result, or that his current personal activities will be hindered. Objections of that kind of course could be resolved in practical terms.

Hence, the subpoena is not unreasonable, and if Addonizio were merely a *witness,* his challenge would fall. But Addonizio says he is a target of the inquiry, and hence the question is whether the *Fourth* Amendment must for that reason be applied differently to him.

In the cases we have cited which developed the meaning of "unreasonable" in the Fourth Amendment's application to subpoenas, the subpoenas called for records of corporations who were clearly the targets of the investigation. In terms of the *Fourth* Amendment, one might think it of no moment whether the target is corporate or animate, or whether the subpoena runs to an individual who is a target or to a mere witness. But the enigmatic decision of *Boyd, supra,* 116 *U. S.* 616, 6 *S. Ct.* 524, 29 *L. Ed.* 746, goes the other way. There the order to produce was upon an individual who was the

target of the forfeiture proceedings. The demand of the order was anything but burdensome. Indeed, the documents involved were but a few and were precisely identified, and since the defendant was himself to cull them, there could be no ranging search through his papers. As we said earlier, the Court in *Boyd* was unanimous that the Fifth Amendment protected the defendant, but the majority found that the Fourth also stood in the way.

 Why the majority in Boyd labored so hard to that end is perplexing. The Fifth Amendment is wholly adequate to protect an individual so situated. Indeed it is more pervasive than the Fourth, for it seems evident that a subpoena upon a suspect or a defendant could not be used to obtain things which could be seized from him under a search warrant. For example, he could not be subpoenaed to produce the gun or the loot, no matter how probable the cause, for the Fifth protects the individual from coercion upon him to come forward with anything that can incriminate him. *Schmerber v. California,* 384 *U. S.* 757, 763–765, 86 *S. Ct.* 1826, 16 *L. Ed. 2d* 908, 916–917 (1966); *United States v. White,* 322 *U. S.* 694, 698, 64 *S. Ct.* 1248, 88 *L. Ed.* 1542, 1546 (1944).

 Although the Fourth seems to serve no discernible end when a subpoena is involved and the Fifth Amendment privilege is at hand,[2] nonetheless *Boyd* remains, and Addonizio could invoke it, provided, of course, it appears, as in *Boyd,* that the purpose was to obtain things to incriminate him. As to this, the showing sufficient for reliance upon the Fifth should be sufficient to support reliance upon the Fourth. As we have said, Addonizio, who obviously is a target of the inquiry, is protected by the Fifth Amendment, and hence, under *Boyd,* his claim under the Fourth must also be upheld.

---

[2] We assume that a grant of immunity which suffices to prevent the subpoenaed individual from relying upon the Fifth would also prevent his reliance upon the Fourth Amendment right found by *Boyd* and hence that no difference exists in this regard.

### III.

This brings us to the grand jury subpoenas upon the bank (The First National State Bank of New Jersey) and upon the brokerage firm (Auchincloss, Parker and Redpath). As to the bank, one subpoena required production of the following with respect to Addonizio and his wife: (1) copies of all credit applications; (2) ledger account sheets (savings and checking) for the years 1962 to date; (3) records of any past or present Christmas Clubs; (4) records of safe deposit boxes; (5) copies of deposit slips, checks drawn and checks deposited to the account in the Federal Square Branch. A second subpoena to the bank called for all deposit slips from September 1, 1967 to date and copies (front and back) of all checks drawn against an account specifically identified by number. A third subpoena issued to the brokerage firm for the record of the accounts with it.

Neither the bank nor the brokerage firm complained of the subpoenas, but Mr. and Mrs. Addonizio sought to restrain them from complying. No effort was made below or before us to differentiate the situation of Mrs. Addonizio from that of her husband, and hence we will treat them as one. Indeed we do not know whether there is an account in the name of Mrs. Addonizio alone with either the bank or the brokerage firm.

Addonizio says the Fourth Amendment blocks any examination whatever of the bank and brokerage records. In support of that proposition, his petition as to the subpoenas to the bank alleged:

"During the time that Petitioner Hugh J. Addonizio has been a depositor in the First National State Bank of New Jersey, Petitioners have believed and assumed that information given to the Bank and the records which Hugh J. Addonizio has disclosed to the Bank would be held as a sacred trust and treated as privileged and confidential and kept privileged and confidential between Petitioners and the Bank."

and his petition with respect to the subpoena to the brokerage firm contained a like allegation.

As we have noted, neither the bank nor the brokerage firm said the subpoenas are unreasonable in any respect. So far as one can tell from the record, there is no basis upon which either the bank or the brokerage firm could maintain an invasion of such Fourth Amendment rights as they may have. We need not add to the discussion under Part II of this opinion of the impact of the Fourth Amendment upon a subpoena duces tecum in a grand jury investigation.

Nonetheless Addonizio claims he has standing to complain under the Fourth Amendment, citing cases running from *Jones v. United States, 362 U. S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697* (1960), to *Simmons v. United States, 390 U. S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247* (1968), and *Mancusi v. De Forte, 392 U. S. 364, 88 S. Ct. 2120, 20 L. Ed. 2d 1154* (1968). He does not seek merely to stand in the shoes, so to speak, of the bank and the brokerage firm, for they have nothing to complain about. Rather he asserts Fourth Amendment rights in the subject matter which neither the bank nor the brokerage firm possesses. We see no basis for that claim.

The subpoenaed records are not his. This is true even though for some purposes the bank or the brokerage firm may be the "agent" of Addonizio, for the bank and the brokerage firm are independent entrepreneurs and the records are entirely their property. Thus the subpoena touched nothing in which Addonizio has a property right. Nor, if one would say a subpoena "invades" premises in which the subpoenaed material reposes, can it be said that Addonizio had an interest in the realty or was present at the time of the "constructive" search or seizure. In the cases cited in the preceding paragraph, the searches invaded the privacy of the owners or possessors of realty and the question was whether the defendant could claim there was also an intrusion upon his Fourth Amendment interests. Where, however,

the search does not invade the Fourth Amendment rights of the possessor, it is difficult to see how some stranger to that possession can maintain a Fourth Amendment complaint.

In any event, we are dealing with a subpoena, and as to such a fictional search and seizure, Addonizio's claim amounts to the proposition that he has a Fourth Amendment interest in all articles of evidence by whomever held, and indeed an interest which will support an attack on a subpoena which the owner himself cannot make. The Fourth Amendment has no such office. Hence it is uniformly held that the customer of a bank has no "standing" to challenge a subpoena of the bank under the Amendment. *Galbraith v. United States,* 387 *F. 2d* 617, 618 (10 *Cir.* 1968); *De Maslers v. Arend,* 313 *F. 2d* 79, 85 (9 *Cir.*), cert. dismissed, 375 *U. S.* 936, 84 *S. Ct.* 341, 11 *L. Ed. 2d* 269 (1963); *Foster v. United States,* 265 *F. 2d* 183, 187–188 (2 *Cir.*), cert. denied, 360 *U. S.* 912, 79 *S. Ct.* 1297, 3 *L. Ed. 2d* 1261 (1959); *United States v. Gerhart,* 275 *F. Supp.* 443, 462–463 (*S. D. W. Va.* 1967); *Leonard v. State,* 232 *N. E. 2d* 882, 885 (*Sup. Ct. Ind.* 1968).

Addonizio's argument seems to rest upon an assumption that the Fourth Amendment makes transactions "confidential." Of course, it does not. It secures privacy in places only against contemporaneous intrusion. Thus, although the State may not invade a man's home to see or to listen, the Fourth Amendment does not bar compulsory disclosure thereafter of what was done or said. Hence, although *Katz v. United States,* 389 *U. S.* 347, 88 *S. Ct.* 507, 19 *L. Ed. 2d* 576 (1967), cited by Addonizio, holds that the Fourth Amendment protects a man in a telephone booth from electronic surveillance by government of what he says, the parties to the conversation are free to disclose its content and may be compelled to do so. The Court in *Katz* expressly said the Fourth Amendment does not cover the whole range of privacy (389 *U. S.,* at 350, 88 *S. Ct.,* at 510, 19 *L. Ed. 2d,* at 581):

"Secondly, the Fourth Amendment cannot be translated into a general constitutional 'right to privacy.' That Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all. Other provisions of the Constitution protect personal privacy from other forms of governmental invasion. But the protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States."

Thus the subject of "confidential" communications is a wholly different matter. The several States provide for sundry privileges, and at the moment we can think of none that is compelled by the Constitution except that of attorney and client and there only insofar as the Sixth Amendment right to counsel in criminal matters is concerned. There may be express or implied promises of confidentiality in certain relationships, but of course the parties may not create their own constitutional coverage. Prior to our statute establishing a patient-physician relationship, we found an obligation in a physician not to gossip about his patient's medical problems, but we noted that the doctor remained obligated to be a witness in response to judicial process. *Hague v. Williams,* 37 *N. J.* 328, 334–336 (1962).

And so here, we may accept Addonizio's assertion that he expected the bank and the brokerage firm to keep his transactions confidential, and we may assume a bank or brokerage firm would violate a contractual obligation if it disclosed details of the account to someone who had no legitimate interest, but both remain obliged to respond to subpoena. See 10 *Am. Jur. 2d, Banks,* § 332, *p.* 295. It is uniformly held that a bank and a brokerage firm must comply with a subpoena and the customer cannot prevent the disclosure. See *Bowles v. Shawano Nat. Bank,* 151 *F. 2d* 749 (7 *Cir.* 1945), *cert.* denied, 327 *U. S.* 781, 66 *S. Ct.* 680, 90 *L. Ed.* 1008 (1946) ; *McMann v. Securities & Exchange Commission,* 87 *F. 2d* 377, 109 *A. L. R.* 1445 (2 *Cir.*), *cert.* denied, *McMann v. Engle,* 301 *U. S.* 684, 57 *S. Ct.* 785, 81

*L. Ed.* 1342 (1937); *State v. Hambrick,* 65 *Wyo.* 1, 196 *P. 2d* 661, 198 *P. 2d* 969 (1948); *State v. ex rel. G. M. Gustafson Co. v. Crookston Trust Co.,* 222 *Minn.* 17, 22 *N. W. 2d* 911, 916–917 (1946); Annot., 109 *A. L. R.* 1450 (1937); 8 *Wigmore, Evidence* (*McNaughton rev.* 1961) § 2286, at 528–530.

We are referred to *Brex v. Smith,* 104 *N. J. Eq.* 386 (*Ch.* 1929). There the prosecutor, without any judicial process, called upon banks to deliver the records of the accounts of policemen. The Court of Chancery restrained that action. It is enough to say with respect to that case that the opinion recognized a grand jury subpoena would be something else (*p.* 390).

No doubt a man may be hurt by a governmental inquiry of his family, friends, neighbors or business associates, but the problem is beyond the reach of either the Fourth or the Fifth Amendments. Nor does the problem repose only in a grand jury investigation, for it may arise whenever a police agency conducts an investigation. One reason for the secrecy of the grand jury is to minimize the possibility of such injury, and no responsible enforcement agency would give avoidable publicity to its probe.

That is another matter and is not involved here. As we noted in Part II, Addonizio did not challenge the validity of the grand jury investigation below, and when he sought to raise that question on appeal he did so only in terms of the requirements of the Fourth Amendment. We have already discussed at some length the authority of a grand jury to ascertain whether the criminal laws have been violated, and we have found no reason to doubt the good faith and validity of this probe.

It may be assumed that a court would protect against abuse by investigation as it would protect against any other arbitrary behavior in office. But we think it fitting to stress the need for broad power in the police and the grand jury to probe widely for evidence of crime. This power is all the

more vital today because the ability of the police to go directly to the suspect or his property for evidence of guilt has been significantly limited by a run of decisions. The State is therefore remitted to more extensive surveillance and circumstantial investigation.

This kind of probing is peculiarly needed to uncover corruption in office. Such offenses are covertly committed. As to them, a direct inquiry of an incumbent is not likely to be productive. Indeed that approach is now specially restricted. Although *New York Times Co. v. Sullivan,* 376 *U. S.* 254, 84 *S. Ct.* 710, 11 *L. Ed.* 2d 686 (1964), and its progeny found that the public officer should be more exposed to published accusations than citizens not in the public arena, yet an additional restraint was imposed upon the power to deal with crime in office by *Garrity v. New Jersey,* 385 *U. S.* 493, 87 *S. Ct.* 616, 17 *L. Ed.* 2d 562 (1967). There, a bare majority, concerned lest the constitutional rights of public officials be "watered down," held that admissions of crime in office made by a policeman could not be used in a prosecution of him because a statute of our State would have removed him from office if he had refused to answer.[3]

---

[3] The question remains whether anything at all can be done with a public officer who admits crime in office. Although it has been held since *Garrity* that an officer may be removed if he refuses to answer questions relevant to his performance in office, as our statute, *N. J. S.* 2A :81–17.1 and 17.2 provides, *Gardner v. Broderick,* 392 *U. S.* 273, 88 *S. Ct.* 1913, 20 *L. Ed.* 2d 1082 (1968), and *Uniformed Sanitation Men Ass'n. v. Commissioner of Sanitation of City of New York,* 392 *U. S.* 280, 88 *S. Ct.* 1917, 20 *L. Ed.* 2d 1089 (1968), it remains obscure whether an officer who does answer can be fired because of the criminal conduct he reveals. If, as *Garrity* holds, the answers are "coerced" because the officer would be removed if he remained silent, the question is whether his "coerced" answers can be used to forfeit his office and related benefits. It is unthinkable that an officer could thus thumb his nose at the citizens who employ and pay him. Yet the thesis of *Garrity* would seem to say he could. We do not, however, assume the majority in *Garrity* would pursue their theme that far. Logic, in law at least, does bend with consequences.

For the reasons given, the order with respect to the subpoena of Addonizio to produce his records is reversed, and the order with respect to the subpoenas to the bank and the brokerage firm is affirmed.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, and HANEMAN—6.