790 So.2d 454 (2001)
CHECK `N GO OF FLORIDA, INC., Appellant,
v.
STATE of Florida, etc., Appellee.
No. 5D00-3055.
District Court of Appeal of Florida, Fifth District.
May 11, 2001.
Rehearing Denied July 20, 2001.
*456 Jerome W. Hoffman, Susan L. Kelsey and Merideth Nagel of Holland & Knight LLP, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General, Roger B. Handberg, Cecilia Bradley and Lisa M. Raleigh, Tallahassee, and Jacqueline H. Dowd, Orlando, Assistant Attorney Generals, for Appellee.
MONACO, D., Associate Judge.
This case presents questions concerning the scope of the investigatory powers of the Attorney General.
The State of Florida, Office of the Attorney General issued an investigatory subpoena duces tecum to the appellant, Check `n Go of Florida, Inc., pursuant to section 895.06(2), Florida Statutes (2000), seeking documents concerning certain "consecutive" or "rollover" transactions between Check `n Go and its customers. When Check `n Go declined to comply, the Attorney General moved to compel compliance in circuit court. The circuit court rendered a final order granting in part and denying in part the Attorney General's motion, and Check `n Go appealed.
Check `n Go is a Florida corporation, registered under chapter 560, Florida Statutes (2000), as a check-cashing company. Typically, a customer would write a personal check which Check `n Go would hold for an agreed upon time (normally until the customer's next payday), before cashing. In return, Check `n Go would provide cash equal to the face amount of the check, less a fee. "Payday loans" of this sort are governed by chapter 560.
Prior to May 5, 1998, it was common for payday lenders to allow customers to renew or "rollover" their transactions for an additional fee, without presenting any new payment instrument, and without receiving any new cash. On May 5, 1998, the Office of the Comptroller, Division of Banking and Finance, issued a letter to all "check cashers" in Florida regarding its position on certain practices of the check cashing industry, specifically addressing rollovers. The letter concluded that the additional fees paid by the customer for a rollover transaction might constitute interest, and transactions in this form would be considered to be an extension of credit subject to the usury laws of the state. Check `n Go asserts that upon receiving the letter, it immediately changed its policy in Florida to prohibit rollovers. Subsequent to May 5, 1998, Check `n Go alleges that it has since required the termination of one transaction by payoff prior to the initiation of a new transaction for new cash and fees. Check `n Go describes this procedure as a "consecutive transaction."
Perhaps in response to this Court's opinion in FastFunding The Co. v. Betts, 758 So.2d 1143 (Fla. 5th DCA 2000), the Comptroller asked the Attorney General for an advisory opinion regarding the application of the state's usury laws to payday loans. The Attorney General opined on May 1, 2000, that payday loans are subject to the *457 laws prohibiting usurious rates of interest, and that:
A company registered under Chapter 560, Florida Statutes, may cash personal checks for the fees prescribed in that chapter without violating the usury laws only if such transactions are concluded and are not extended, renewed or continued in any manner with the imposition of additional fees.
Op. Atty. Gen.2000-26.
A few weeks after issuing its opinion, the Office of the Attorney General served Check `n Go with a subpoena duces tecum pursuant to its powers under the Florida RICO Act.[1] The subpoena required production of "each and every written, recorded, or graphic matter of any kind, type, nature, or description that is or has been in the possession, custody, or control of Check `n Go, or of which Check `n Go has knowledge" relating to twenty-two separate categories. The subpoena purported to require production of documents from January 1, 1994, to the present, even though Check `n Go did not come into existence until 1996, and potentially included documents concerning transactions and activities outside of Florida. Check `n Go objected to the subpoena, and eventually the Office of the Attorney General filed its motion to compel in the circuit court to seek compliance. Check `n Go moved to quash the subpoena on constitutional grounds. The trial court, in granting in part and denying in part each party's motion, eliminated three categories of materials required of Check `n Go, and required production of the remainder. Check `n Go thereafter appealed.

A. The authority of the Attorney General to issue the subpoena.
The Attorney General's office issued the subpoena duces tecum in question pursuant to its investigatory authority under section 895.06, Florida Statutes (2000), which reads in part:
If, pursuant to the civil enforcement provisions of s. 895.05, an investigative agency [including the Attorney General] has reason to believe that a person or other enterprise has engaged in, or is engaging in, activity in violation of [the Florida RICO Act], the investigative agency may administer oaths or affirmations, subpoena witnesses or material, and collect evidence.
(Emphasis added).
Crimes chargeable under chapter 687, Florida Statutes (2000), relating to usurious practices are included among the RICO violations contemplated by the grant of investigative authority, and the subpoena of the Attorney General in this case was issued as part of an investigation into whether Check `n Go violated state usury laws. Check `n Go, however, asserts that the challenged subpoena is invalid because the Attorney General did not have "reason to believe" that Check `n Go had violated or was violating the law.
No case law in Florida defines the "reason to believe" standard in the context of section 895.06. There is, nevertheless, significant guidance to be found in the definition of this term in other contexts, and in cases discussing the purpose of investigatory subpoenas in general.
The purpose of the subpoena power under section 895.06 is to allow an investigative agency to investigate, collect evidence and determine if a RICO violation has occurred. The level of proof required of the investigative agency must suggest something more than a fishing expedition, and something less than probable *458 cause. Because the purpose of an administrative investigation is to discover and procure evidence, and not to prove a pending charge or complaint, its function is distinct from an adjudication, and, accordingly, more latitude is allowed in considering the foundation for the subpoena. See Ezell v. Smith, 446 So.2d 253, 255 (Fla. 5th DCA 1984); see also Genuine Parts Co. v. Fed. Trade Comm'n, 445 F.2d 1382, 1388 (5th Cir.1971); Fla. Dep't of Ins. & Treasurer v. Bankers Ins. Co., 694 So.2d 70, 72 (Fla. 1st DCA 1997). An investigation, in short, does not determine guilt or innocence. Ezell, 446 So.2d at 255; see also Dep't of Legal Affairs v. Jackson, 576 So.2d 864, 865 (Fla. 3d DCA 1991).
The term "reason to believe" has also been used to describe the level of information required of a law enforcement officer who wishes to frisk a detained citizen. In a Terry[2] stop, a law enforcement officer must have reason to believe that a detainee is armed before the officer is permitted to frisk that person. The Terry court held that:
[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others is in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or `hunch,' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience.
Terry, 392 U.S. at 27, 88 S.Ct. 1868 (citations omitted) (emphasis added); see also Lester v. State, 754 So.2d 746 (Fla. 1st DCA 2000); State v. Burns, 698 So.2d 1282, 1284 (Fla. 5th DCA 1997).
The Terry court fashioned an objective or reasonably prudent person standard for the term "reason to believe," which appears to translate well in the context we are now considering. We conclude, therefore, that the test to be applied in determining whether the Attorney General is authorized to issue an investigatory subpoena under section 895.06(2), is whether under the circumstances a reasonably prudent person would be warranted in the belief that a person or other enterprise who is the subject of the subpoena has engaged in, or is engaging in, activity in violation of the Florida RICO Act.
At the time that the subpoena was issued, the Attorney General knew or had available at least the following information:
1. Check `n Go admitted that it had routinely engaged in rollovers prior to the May 1998 letter, and that it had engaged in additional rollovers until at least August of 1998, three months after the issuance of the Comptroller's letter.
2. Check `n Go said that after May 1998, it began using consecutive transactions, which it felt were permitted by the usury statutes.
3. A previous Check `n Go customer alleged in an affidavit that he engaged in rollover transactions with Check `n Go.
4. An investigative log from the Pinellas County Department of Consumer Protection detailed the filing and *459 resolution of a complaint by a former Check `n Go customer showing possible rollover transactions as late as April of 1999.
5. A survey taken in the summer of 1999, indicating that Check `n Go allowed rollovers in its St. Petersburg office at that time.
The materials available to the Attorney General reflect that Check `n Go had unquestionably engaged in rollover transactions before the May 5, 1998 letter from the Comptroller. The Attorney General is certainly accorded the flexibility to review these transactions to determine whether the usury and RICO statutes were violated prior to that date. After all, the Attorney General is not limited to investigating current violations of the law. Moreover, a reasonable person would likely conclude that the Attorney General would be warranted in believing that the consecutive transactions entered into after the May 5, 1998 letter might well constitute an activity in violation of the usury and RICO statutes, particularly in view of the fact that Check `n Go has admitted that it engaged in some prohibited rollover transactions after that critical date. Accordingly, after reviewing the information available to the Attorney General in the present case, we conclude that the trial court was correct in its determination that the Attorney General was authorized to issue the subpoena.

B. The scope of the subpoena.
Overbroad or unreasonable subpoenas, including investigative subpoenas, violate the Fourth Amendment protection against unreasonable searches and seizures. See Hale v. Henkel, 201 U.S. 43, 76, 26 S.Ct. 370, 50 L.Ed. 652 (1906)(overruled on other grounds but subsequently cited with approval in Dean v. State, 478 So.2d 38 (Fla.1985)). "The gist of the protection is ... that the disclosure sought shall not be unreasonable." Okla. Press Publ'g Co. v. Walling, 327 U.S. 186, 208, 66 S.Ct. 494, 90 L.Ed. 614 (1946); see also Imparato v. Spicola, 238 So.2d 503, 511 (Fla. 2d DCA 1970).
The reasonableness standard compelled by the Fourth Amendment for federal administrative purposes was articulated by the United States Supreme Court in Oklahoma Press. The threshold requirements for reasonableness of this category of subpoenas were generally described by the Court as follows:
1. The agency issuing the subpoena must have the power by law to do so.
2. The materials requested must be relevant to the authorized investigation.
3. The items sought must be described with particularity and with definiteness.
Okla. Press, 327 U.S. at 208 66 S.Ct. 494; see also Donovan v. Lone Steer, Inc., 464 U.S. 408, 415, 104 S.Ct. 769, 78 L.Ed.2d 567 (1984).
The authority of an administrative agency to compel the production of information was further refined in United States v. Morton Salt, 338 U.S. 632, 651-54, 70 S.Ct. 357, 94 L.Ed. 401 (1950). The Supreme Court noted there that the power involved in an administrative subpoena is the power to get information, and analogized the breadth of the agency's inquiry to be similar to that of a grand jury. The Court reaffirmed, however, that the protection afforded the subpoenaed party is that "the disclosure sought shall not be unreasonable." Morton Salt, 338 U.S. at 652, 70 S.Ct. 357.
The conclusion is the same when Florida case law is examined. The Florida Supreme Court spoke on the quantum of *460 information that could be lawfully discovered through an administrative subpoena in Dean v. State, 478 So.2d 38, 40 (Fla. 1985). There, the court reaffirmed that the subpoena must be "properly limited in scope, relevant in purpose, and specific in directive," in order not to be unduly burdensome. The Second District Court of Appeal amplified this principle in holding that: "A subpoena duces tecum may not lawfully require the production of a mass of books and papers, merely so that one may search through them to gather evidence; and an omnibus subpoena for all, or even a substantial part, of the books and records of the subpoenaed party is invalid." Imparato, 238 So.2d at 511; see also Gen. Motors Corp. v. State, 357 So.2d 1045, 1047 (Fla. 3d DCA 1978). This holding is congruent with the position of the United States Supreme Court, speaking through Justice Holmes, to the effect that:
Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime.... It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up.
Fed. Trade Comm'n v. Am. Tobacco Co., 264 U.S. 298, 305, 44 S.Ct. 336, 68 L.Ed. 696 (1924) (citation omitted).
The limits of the production that can lawfully be sought in an investigatory subpoena cannot be reduced to a formula. "[R]elevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry." Okla. Press, 327 U.S. at 209, 66 S.Ct. 494. Thus, each investigatory subpoena must be evaluated on its own merits.
In light of these enduring principles, it has become apparent that the subpoena issued by the Attorney General in this case is overbroad. It does, indeed, seek a substantial part of the books and records of Check `n Go, even seeking documents preexisting the date of incorporation, and concerning matters that have transpired outside the State. In addition, the subpoena seeks to compel the production of all payday loan transactions, even those that were not the subject of a rollover or any other variety of consecutive transaction. We have concluded that, under the facts of this case, the Attorney General may not compel the production of documents (a) created prior to the date of incorporation of Check `n Go, nor (b) concerning transactions occurring outside the state of Florida, nor (c) concerning ordinary, as opposed to rollover or consecutive transactions. To the extent that the subpoena exceeds these limits, it is overbroad, and may not be enforced.[3] Obviously, if the office of the Attorney General later discovers information that would bring any of the excluded items within the ambit of its authority, a further investigatory subpoena may be issued.
*461 Accordingly, the order is affirmed in part and reversed in part, and remanded to the trial court for further proceedings not inconsistent with this opinion.
AFFIRMED in part; REVERSED in part; REMANDED.
SHARP, W., and PETERSON, JJ., concur.
NOTES
[1] §§ 895.01-895.06, Fla. Stat. (2000)
[2] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[3] For the guidance of the trial court, items 1, 3a, 3b, 5c, 6 and 8 are deemed to be overbroad and are to be stricken. Items 3c, 3d, 3e, 5a and 5b are only enforceable to the extent that they specifically concern rollover or other consecutive transactions occurring after the 1996 creation of Check `n Go, and only such transactions as were consummated in Florida. Items 2, 17, 18, 19 and 21 are enforceable, but only with respect to documents dated after the 1996 creation of Check `n Go. All other items are enforceable, but only with respect to documents dated after the 1996 creation of Check `n Go, and only insofar as they relate to Florida transactions.